COMMONWEALTH vs. ELLA MAE ELLISON.

Suffolk. March 6, 1978. — July 18, 1978.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Evidence,* Materials produced on demand. *Practice Criminal,* New trial, Capital case, Disclosure of statements by witnesses, Suppression of evidence by prosecutor.

Statement of reasons by this court for reciting the details of the record of convictions of the defendant for armed robbery and for murder in the first degree, and of the record of the denial by a judge of the Superior Court, other than the trial judge, of the defendant's post-conviction motion for a new trial. [16–17]
Upon appeals from conviction of a woman of armed robbery in a pawnshop and of murder in the first degree of a police officer, crimes in which three men participated, and on appeal from the denial of the defendant's motion for a new trial, this court stated that a combination of circumstances put in question the value of testimony of the two men participants who were the key witnesses against the defendant at her trial and who gave at least three basically different accounts of the crimes, and who recanted their trial testimony by affidavits and by testimony on the new-trial motion [18–20]; the prosecutor's failure to turn over exculpatory material to the defendant on specific requests, especially the initial statements of the two key witnesses, which were silent as to the defendant but not for that reason exempt from disclosure as the prosecutor and the trial judge erroneously believed, denied the defendant due process of law as stated in *United States* v. *Agurs,* 427 U.S. 97, 106 (1976) [20–22].

The rule in *Leonard* v. *Taylor*, 315 Mass. 580 (1944), was totally inapplicable to a situation in a criminal case in which the defendant sought discovery of exculpatory material. [22–23]

Where throughout proceedings leading to convictions of a woman, on dubious proofs, of armed robbery and of murder in the first degree, the defendant filed timely specific requests for disclosure by the prosecutor of exculpatory material which left him in no doubt as to what was wanted, identification of the vehicle used and of the robbers, and the prosecutor made only late, piecemeal and incomplete disclosures, and at trial there was no satisfactory substitute for the material withheld, the withholding of the material sought, and this court's "profound doubt" as to the defendant's guilt, necessitated reversal of the judgments and setting aside of the verdicts, with leave to the Commonwealth to retry the cases. [23–27]

INDICTMENTS found and returned in the Superior Court on May 15, 1974.

Pretrial motions were heard by *McLaughlin*, C.J., and the case was tried before *Robert Sullivan*, J. A motion for a new trial was heard by *Donahue*, J.

*Max D. Stern* for the defendant.

*Robert J. McKenna, Jr.*, Assistant District Attorney (*Edward M. Burns*, Legal Assistant to the District Attorney, & *Paul A. Mishkin*, Special Assistant District Attorney, with him) for the Commonwealth.

*Charlotte Anne Perretta* for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

KAPLAN, J. For involvement in the robbery of a pawnshop during which a man was killed, a jury found the defendant Ella Mae Ellison guilty on an indictment for murder in the first degree and on four indictments for armed robbery. She received concurrent life sentences.[1] This is an appeal pursuant to G. L. c. 278, § § 33A-33G, from the judgments of conviction; consolidated herewith

---

[1] The judge's charge dealt mostly with felony-murder but also mentioned that, if the killing was found not to have occurred in the commission of the robbery, the defendant might still be found guilty of murder if she was found sufficiently implicated in the final homicide. See *Commonwealth* v. *Richards*, 363 Mass. 299, 306-307 (1973).

is an appeal from the denial of her postconviction motion for a new trial.

The defendant contends that her convictions should be reversed and a new trial ordered because of the unsatisfactory character and thinness of the case made against her and because of the illegal withholding by the prosecution of exculpatory evidence.[2]

We conclude that these two related weaknesses put the convictions so far in question that we are obliged to set aside the verdicts with leave to the Commonwealth to retry the case. It becomes necessary to examine the facts or alleged facts in considerable detail, and in particular to examine the shifting statements given from time to time by the two participants in the crime on whose testimony the defendant's conviction actually depended. As the accounts of the two men are set forth, starting with their arrests, it should be observed that the jury in the present case were not made aware of the entire content of this material, and only after the defendant's conviction did defense counsel secure full access to it.

1. *Undisputed facts of the crime.* About noon of November 30, 1973, three young black residents of the Columbia Point housing project in Dorchester entered the street level premises of Suffolk Jewelers, Inc., a pawnshop on Washington Street in Roxbury. These were Nathaniel Williams, aged twenty, Anthony Irving, seventeen, and Terrell Walker (evidently of comparable age). All were armed. They ordered employees to produce money and jewelry and open the safe, and then began collecting trays of jewelry and the like. A scuffle broke out with John Schroeder, a Boston police officer in civilian clothes who happened to be present, in the course of which Walker shot him dead.[3] The three robbers fled with about $900

---

[2] On the latter point, a brief was submitted by the Massachusetts Association of Criminal Defense Lawyers as a friend of the court.

[3] This incident is more fully described in the appeal of Terrell Walker's conviction, *Commonwealth* v. *Walker*, 370 Mass. 548, cert. denied, 429 U.S. 943 (1976).

and some 250 rings and watches, and perhaps other things.

The three (whether the defendant was a fourth is in question) went from the robbery to the apartment of Darlene Freeman (the fiancée of Walker's brother, Arnold) at Columbia Point in Dorchester. Terrell Walker and Irving, at least, had been at that apartment in the morning. During the afternoon the proceeds of the crime were divided up. Williams received Schroeder's .38 caliber police revolver. Williams and Irving used some of their share of the money to buy heroin which they took by intravenous injection.

In the late afternoon these two decided to flee to Atlanta and boarded a southbound bus leaving at 6 P.M. Walker preferred to remain in Boston. Boston police, having obtained descriptions of Schroeder's assailant from eyewitnesses, and knowing of two outstanding warrants for Walker's arrest, proceeded in the late afternoon to Darlene Freeman's apartment in quest of Walker. Freeman in response to police demand managed to release a door bolt and the police entered and arrested Terrell Walker. From Freeman the police learned that Williams and Irving were Walker's partners in the crime. An alert went out to police forces along the bus route to pick up the two men.

Sometime next day, December 1, police in Danville, Virginia, boarded the bus and arrested Williams and Irving. In their possession were found heroin, weapons (Williams had Officer Schroeder's gun), and jewelry taken from the pawnshop.

2. *Statements at Danville.* The men were questioned separately by the Danville police within a few hours of arrest. Each gave a signed statement. The import of the statements was that Williams at his apartment received a telephone call from Walker on the morning of November 30. Walker proposed that they rob the Suffolk pawn-

shop. Williams agreed, and later Walker and Irving came by in a stolen white car—according to Irving, a Mercury stolen by himself and Walker the day before, November 29. Williams said Walker gave him a gun when they met. The three robbed the store around noon, the policeman being killed. They drove off. Neither statement made mention of the defendant or any fourth participant.

Next day, December 2, Boston police officers who had come to Danville interviewed the two men there. The conversations were taped. Irving's account was essentially unchanged, but he added that the white car had a dark top and now stated that only three men engaged in the holdup and no one stayed in the car. Williams, however, put a black girl in the picture—she was previously unknown to him, looked to be eighteen, and was "lighter-skinned" or "medium." Williams reiterated that the group picked him up, then they drove to the pawnshop in a stolen white car (he was not sure of the make). The girl, according to Williams, drove the car, waited in it while the robbery took place, returned to Freeman's with the three, and was given some money and rings there. He and Irving took a taxi to a bus station later in the day.

3. *Plea bargains of Williams and Irving.* The two were confined at the Charles Street jail in Boston, where they shared a cell for some months. They were indicted for murder in the first degree and armed robbery on December 13. Around the new year, appointed counsel interviewed their respective clients. About February, 1974, counsel each spoke with the prosecutor to see whether a plea bargain was possible despite the great strength of the Commonwealth's case against them stemming from the confessions, apprehension with the jewelry, and other impressive evidence. According to Irving's attorney, he told his client that negotiations could succeed only if the whole story was told including the identity of the girl driver Williams had introduced. As appears from counsel's testimony at the new-trial hearing later described, Irving at first resisted. By April, agreements had been

reached with the prosecutor that both Irving and Williams would be allowed to plead guilty to murder in the second degree in exchange for their cooperation, including testimony against Walker.[4]

In early May, after talking to counsel, Officer Robert Hudson of the Boston police interviewed Williams and Irving separately. Both confessed their involvement, and now stated that a woman named "Sue," known to them from the Columbia Point project, drove them to and from the robbery. They described her car. There is no dispute that the Sue mentioned was the present defendant. She was arrested in May in Rochester, New York, where she had moved with her children, and was indicted on the murder and armed robbery charges on May 15.

4. *Testimony of Williams and Irving at the Walker trial.* Williams and Irving both testified for the Commonwealth at the July, 1974, trial of Terrell Walker, and repeated what they had told Officer Hudson. These new stories of the men departed from the Virginia accounts (though not wholly agreeing with each other) as to how Williams met the others; how guns were distributed; the identity of the driver and of the automobile; how the loot was shared; and how they went to the bus station. The two men were now in accord on a central theme: that the present defendant drove them to and from the pawnshop in her own car.

Williams testified that Walker, telephoning him on November 30, said he was calling from the defendant's apartment on Monticello Road at Columbia Point. Williams agreed to join in the suggested robbery, and walked over to the defendant's apartment—he was not picked up—arriving between 9:30 and 10 A.M. There he saw Walker, Irving, and the defendant, and there guns were

_____

[4] There was no agreement about recommendations on the armed robbery charges except that the prosecution would take into account the cooperation given. Shortly after the verdicts in the present case, Williams and Irving pleaded guilty to murder in the second degree and armed robbery charges and received concurrent life sentences.

handed out. The four proceeded directly to the pawnshop in the defendant's car with the defendant driving; there was only a stop to buy cigarettes. After the robbery they drove to Freeman's apartment. At that place they divided four ways a cash take Williams put at $300, after which the defendant left. The three men went into the bathroom to divide the jewelry. Toward the end of the day, Williams and Irving paid a man (not a taxi) to drive them to the bus station. On cross-examination Williams said he first found out about the prosecutor's promise to recommend acceptance of a plea the day before he took the stand, and that the promise had never been discussed with him previously. The prosecutor then stated for the record that the plea bargain had been agreed in April.

Irving testified that he and Walker together had formed the robbery plan. They had stolen a car but did not want to use it because it was "hot." They went to the defendant's apartment and she agreed to drive them for some unspecified part of the take. Irving (not Walker) telephoned Williams, who agreed to join. The three left, and with the defendant driving picked up Williams en route. Irving now repeated a detail he had told Officer Hudson which differed from Williams's account, that the group stopped at Darlene Freeman's and secured guns there. Thence the four drove to the pawnshop in the defendant's four-door Ford LTD or Galaxie 500 automobile with the defendant still driving. After the robbery the defendant drove the men back to Freeman's. In the kitchen they divided the money, the men getting about $300 each; the defendant was given about $45 and a watch (absent from Williams's current story). She left. In the bathroom the rings were parcelled out.

5. *Pretrial motions in the present case.* On October 3, 1974, a hearing was held to consider the defendant's pretrial motions. One was a motion for Commonwealth's disclosure of exculpatory evidence. The defendant's attorney said: "I would assume that it included any evidence or statements in the hands of the Commonwealth tending

to show the witnesses of whatever nature stated that or did not state that Mrs. Ellison was present at the events and transactions in the indictment." The prosecutor responded that he had "no objection," and the judge (not the judge who ultimately presided at trial) allowed the motion. Next considered was the defendant's motion to inspect and copy statements made to agents of the Commonwealth by potential prosecution witnesses or others in connection with the Walker case or the present case, and particularly statements of Irving, Williams, Walker, Darlene Freeman, and Anthony Dobson (Dobson's connection will appear). The judge asked whether these persons had testified at the Walker trial and whether a transcript would be made available (the precise relevance of these questions is not apparent); on receiving affirmative answers, the judge denied the motion, and the defense excepted.

The prosecutor did not deliver any of the written or taped Virginia statements to the defense following the October 3 hearing. On November 15, three days before the commencement of trial, the defendant was heard on her renewed motion for exculpatory evidence, asking in particular for any reports "relating to the identity of a motor vehicle" used in the robbery; she also renewed her motion (previously denied) for witness statements. Defense counsel told the judge (who was to preside at trial) that exculpatory evidence was believed to exist; that police reports involving any type of car other than the defendant's should be regarded as exculpatory; and that early statements of Williams or Irving omitting mention of the defendant or her car likewise would be exculpatory. The prosecutor said he had no exculpatory evidence and suggested that he would not consider exculpatory the mere omission of mention of the defendant from a witness statement about the crime. The judge said he agreed that witness silence would be "non-evidence" rather than exculpatory evidence, and suggested that the defense could inquire of the Commonwealth's witnesses at trial whether their early statements mentioned the defendant.

6. *The trial*. (a) *Motion for exculpatory evidence*. At the start of trial on November 18, before the jury were empanelled, the defense applied again for a chance to examine any statements by Williams or Irving that were silent as to the defendant, counsel referring specifically to the statements of December 1, 1973, to the Danville police which had been mentioned at the Walker trial. The application was denied and exception taken.

(b) *Persons present at or after robbery*. Eight persons—customers or employees present during the robbery or police officers who reached the scene—were called by the prosecution, but none had any testimony to give as to the robbers' method of arrival or departure, of any car used, or of any possible fourth participant.

(c) *Freeman*. She related that Terrell Walker and his girl friend, together with his companion Anthony Dobson and Dobson's girl friend, slept at her apartment the night before the robbery. About 9 or 9:30 A.M., Irving arrived, Freeman awakened Walker, and the two men left. According to Freeman, present at the apartment then and throughout the day, besides herself and her young children, were her boy friend Arnold Walker, and Dobson. (A couple of other women were there at least part of the time.) Freeman took a nap from perhaps 11 A.M. until 1 P.M. or as late as 2:30 P.M. She was not aware of anyone entering the apartment during that time. About 3 P.M. Terrell Walker knocked at the door, and Freeman let him come in along with his friend Wilbert Anderson. Between 4 and 4:30 P.M. Williams and Irving arrived. Williams, Irving, Terrell Walker, and Anderson rushed into the bathroom and she heard some loud dealings—she heard the words "thirty-eight" and a voice saying, "Why should you get it when I did it?" At no point during the day, Freeman testified, did she see the defendant, whom she knew from the neighborhood.[5]

---

[5] Note that Freeman passed on the identities of Williams and Irving to the police after the arrest of Terrell Walker, but made no mention of the defendant.

(d) *Dobson.* His testimony paralleled Freeman's in describing the arrival and activities of the three robbers, but his assessments of time were different. He said he slept at Freeman's apartment the night of November 29 and awoke between 12:30 and 1 P.M. Terrell Walker arrived within five or ten minutes, followed shortly by Anderson. Ten minutes later Williams and Irving showed up, and the three with Anderson proceeded to the bathroom. Like Freeman, Dobson heard jingling noises and something of an argument. He heard a voice say, "I did this. This is mine." Shortly Williams and Irving left. Soon the police arrived. Dobson did not testify to having seen the defendant, with whom he was acquainted, at any time that day—in fact he testified he did not see her at the Columbia Point project (where all lived) at any time that November.

(e) *Williams.* The direct testimony of this witness was that Walker telephoned him at 9 or 10 A.M. on November 30. He then left for the defendant's apartment where he found her along with Terrell Walker and Irving. Here the robbery was planned and guns distributed. The defendant drove the men directly to the pawnshop in her automobile, waited for them, and then drove them to Freeman's apartment. Williams testified that all four entered the apartment; he saw Freeman and Dobson, both awake. All four went into the kitchen and gave the defendant some cash and a watch (now conforming in the particular of the watch to Irving's testimony at the Walker trial). The defendant left. The men next went into the bathroom and divided the cash and counted the rings. After about twenty minutes this witness and Irving left to buy and use some heroin. Later that afternoon, Williams said, he and Irving returned to Freeman's. Back to the bathroom they went to divide the rings with Terrell Walker. It was at this time that an argument broke out over possession of the police revolver. Williams and Irving left and "found someone" to take them to the bus terminal.

The cross-examination of Williams led back to the question of the statements he gave after his arrest in Virginia. Defense counsel requested all Williams's early statements in the possession of the Commonwealth. The judge responded that if the defense persisted in its demand for these materials he would require the Commonwealth to furnish them, but in that case the prosecution would be permitted to introduce any portions it pleased under the rule of *Leonard* v. *Taylor*, 315 Mass. 580 (1944). On those terms, the defense abandoned its demand while excepting and insisting that the *Leonard* rule was inapplicable and that it was entitled to see the materials without such strings attached.

On resumed cross-examination, Williams admitted he had not referred to the defendant in his statements to the Danville or Boston police in Virginia, but it did not emerge that in his first statement he had not mentioned any fourth participant at all. Williams also acknowledged that he told police officers of both forces in Danville that a stolen car was used; he went on to testify that twenty-four hours before the robbery he had seen Irving driving a stolen car. He added that it was not until May, 1974, that he told the police anything other than that a stolen car was used. The witness was also asked about his plea bargain, and repeatedly claimed it was July before he found out he would get the benefit of a recommendation in return for testifying.

At this point the prosecutor offered to let in the tape of Williams's statement given to the Boston police in Virginia (that tapes existed came out in the cross-examination). Defense counsel listened to the tape and claimed a mistrial on the ground that the Commonwealth had withheld exculpatory evidence. The prosecutor at first consented to a mistrial, then changed his mind, and the judge finally denied the motion, with exception taken. The tape was then played for the jury.

(f) *Irving.* This witness testified that he and Walker decided on the morning of November 30 to commit the

robbery. They paused to inject heroin. Then, at the defendant's apartment, they asked the defendant to drive them because they figured the available stolen car was too "hot." She consented and they called Williams. Irving's story now veered from his testimony at the Walker trial and began to conform to Williams's testimony at the current trial. Thus Williams was not picked up but came by himself to join the others at the defendant's apartment. Thence the defendant drove the group in her car not to Freeman's apartment to obtain guns (which according to this account they already had), but straight to the pawnshop. All went to Freeman's after the robbery. In the kitchen the defendant was given about $40 and a watch, and then left. The three went into the bathroom and split up the jewelry. During this appearance at Freeman's apartment, Irving saw neither Freeman nor Dobson. Like Williams, Irving testified that he and Williams left and later returned to Freeman's and that it was then that an argument occurred over the police revolver. He and Williams soon after found a man to drive them to the bus terminal.

On cross-examination it was brought out that Irving and Williams had been placed in the same cell the previous day when Williams was returned to jail after testifying against the defendant. When pressed on the differences between his current testimony and what he had sworn at Walker's trial, Irving responded that he had been "mistaken" in relating that he, Walker, and the defendant had picked up Williams on the morning and mistaken in saying that they then went to Freeman's to provide themselves with guns.

At a bench conference out of the hearing of the jury the prosecutor now put on the record for the first time that this witness had not mentioned any girl in either of the Virginia statements. During a break in the midst of Irving's cross-examination, the prosecutor allowed defense counsel to hear—for the first time—Irving's December 2 statement to the Boston police. Counsel chose not to run that tape for the jury.

On further cross-examination, Irving differed from Freeman's testimony that he had come to her apartment once on the morning and then left with Walker. Irving put it that he came first between 9:30 and 10 A.M. and Freeman let him in. After talking with Walker he left to buy heroin. Then he returned to Freeman's apartment where someone ("it could have been" Freeman) let him in again. He and Walker injected heroin and planned the robbery. At the end of the day "some man"—not a taxi—took Williams and himself to the bus.

(g) *McConkey*. The only other testimony besides that of Williams and Irving that could be perceived as incriminating the defendant was provided by Officer Lewis G. McConkey of the Boston police who spoke with the defendant in Rochester in May, 1974. She denied she now owned an automobile, but when McConkey pointed to a parked car she admitted it was hers and added that it was not registered. Officer McConkey gave her Miranda warnings and asked her about the pawnshop robbery. She denied involvement. As the police were leaving, McConkey said, the defendant asked how the police got her name. McConkey said, "You're no dope. What do you think?" She said, "It could only come from the three people involved in the hold-up." On cross-examination it appeared that McConkey had made no reference to such a conversation in his report of the visit (as handwritten or typed).

(h) *The defendant*. She testified in her own behalf. She was a twenty-seven year old black woman, mother of four. She is quite dark-skinned. From her home city of Rochester she came to Boston in April, 1973, with her children and "common-law husband," one Pounds. She did domestic work part time. In September she bought a 1969 black and white Ford LTD with New York plates, unregistered. Pounds introduced her to Williams and Irving and a few times in the fall, with Pounds's permission, she gave the men rides in her car. She was also acquainted with Terrell Walker.

On the day of the crime, she had been shopping at a few places she named. She was on her way home about 2 P.M. when she heard that a policeman had been shot.

In February, 1974, Pounds was killed, and her parents, after some effort, persuaded her to return to Rochester. So in March her family came with a truck and moved the defendant and her children. The defendant's version of her conversation with Officer McConkey made no reference to the three men involved in the holdup.

(i) *The defendant's father.* He was a self-employed construction contractor. He testified that he sent his daughter seventeen money orders between April, 1973, and February, 1974.

After closing arguments the judge charged the jury (with exception taken only on a minor point) and the jury returned their verdicts after deliberating for three hours. No motion for a directed verdict was made after the prosecution's case or at the close.

7. *The new-trial motion.* The defendant on May 22, 1975, moved for a new trial. This was heard in November, 1976, by a third judge; the trial judge had died. In the nature of the motion the judge was called on to review the trial record to see whether the verdicts now appeared vitiated by error or against the weight of the evidence; and new evidence was offered for consideration.

The defendant pressed the constitutional error of suppression of exculpatory evidence, and in that connection the material in question, having now, after the conviction, been made fully available to the defendant, was tendered and received in evidence on the motion. Also, some testimony was taken from the attorney who represented the defendant at the trial about how he might have used the withheld material if it had been supplied before trial, and of his difficulty in deciding under pressure of time whether to put the Irving tape before the jury after they had heard Williams's somewhat different interview.

In addition to claims as to the intrinsic weakness of the evidence of guilt presented at trial, the defense now offered affidavits of Williams and Irving (dated in May, 1976) recanting their trial testimony against the defendant. These witnesses also testified on the motion. They said there had been no fourth participant, and that Irving, in a stolen car with Walker aboard, had picked Williams up and driven the group to and from the robbery. The defendant had had no role in any part of the enterprise. Williams said he had invented a girl driver in his December 2, 1973, statement in order to minimize his friend Irving's part in the crime. Both Williams and Irving said they had felt compelled to plea bargain and testify against the defendant out of fear of the death penalty. As Williams had now mentioned a girl, a name had to be supplied—otherwise no bargain. The defendant's name was used because she was not a close friend of either man and because she was known to have left town.

This account was questioned in part by the lawyers who had represented the pair. The lawyers said they had respectively informed their clients that there could be no death sentence. Irving, according to his counsel, had mentioned a girl participant in January but evinced reluctance to involve her; in March he continued reluctant because she was the mother of three or four children. Counsel reiterated that a plea would be impossible unless Irving named and testified against the woman. Williams, said his counsel, had early decided to testify.

The judge filed a memorandum of decision. With respect to the constitutional claim, he held that the prosecution's failure to turn over the statements made to the Danville police was not reason enough to grant a new trial. Through cross-examination and use of the tape recording, the defense had shown that Williams had not mentioned the defendant in either of his early statements and that he had consistently referred to the getaway car as a stolen vehicle. Failure to put the Irving tape before

the jury or to cross-examine Irving on the matter was the choice, if perhaps inexplicable, of defense counsel.

As for the recantations, the judge did not believe them. References to a woman driver were repeated—by Williams on December 2, 1973; by Irving (as just noted) in January and March, 1974. The judge thought it unlikely that the robbery would be executed without someone remaining in the car. One might add to the judge's remarks that Williams's story, that he fabricated a girl driver thinking this would help Irving, does not go down easily. Also, there is difficulty in crediting the men's testimony that they feared a death sentence.

We note that the judge in his memorandum did not attempt to assay afresh the weight of the evidence. Rather he appeared to respond only to whether the suppression of exculpatory evidence or the witnesses' recantation was cause enough to upset verdicts which the jury—as he stressed—returned in a mere three hours.

8. *Observations on standards of review.* On the present review of the judgments of conviction and the denial of a new trial we have conceived for three reasons that we had to get well into the detail of the record.

First, as already suggested, the seriousness of the prejudice flowing from the Commonwealth's failure to make due and timely disclosure of exculpatory material can be fairly judged only in relation to the particulars of the evidence.

Second, even if the judge who ruled on the new trial motion had attempted a full evaluation of the strength of all the evidence, we would be obliged to review it with special care because, with respect to the trial record, the judge had not the closeness to, and familiarity with, the facts that we properly attribute to the judge who actually heard the testimony. It is on the ground of that intimacy with the evidence that we leave largely to the discretion of the judge the question whether a new trial should be granted because the verdicts are not well supported by the proofs, or because of postverdict developments. On

this ground the trial judge is given broad authority by G. L. c. 278, § 29, as appearing in St. 1966, c. 301, to order a new trial "[i]f it appears to [him] that justice may not have been done," even though a judge reading the cold record would not be justified in setting aside the verdict. See *Commonwealth* v. *McCarthy*, 375 Mass. 409 (1978); *Fine* v. *Commonwealth*, 312 Mass. 252, 256-258 (1942). As the present defendant never had the benefit of the trial judge's consideration of her new-trial request, we are in a position to make, and are bound to make, the same scrutiny of the trial record as the judge made or should have made who passed on the new-trial motion, and we are to apply that more liberal standard or attitude which is considered appropriate when the illness or death of the trial judge has made it necessary for the motion to be passed on at second hand. "This court, in passing upon the questions presented for review, may consider the fact that the judge who heard the motions had before him nothing but the stenographic report of the evidence at the trial." *Commonwealth* v. *Gedzium*, 261 Mass. 299, 304 (1927). Accord, *Commonwealth* v. *Richardson*, 1 Mass. App. Ct. 348 (1973).

Third, we are charged by G. L. c. 278, § 33E, with inquiring on every "capital" appeal whether a new trial (or mitigation of sentence) is called for in the light of "the weight of the evidence" (or "any other reason that justice may require"). See the discussion in *Commonwealth* v. *Baker*, 346 Mass. 107, 109 (1963). The exercise demands a review of the whole case in "a large or nontechnical sense." *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977). And a "profound doubt" as to the defendant's guilt generated by the record surely counts as a compelling instance for a new trial under § 33E. *Commonwealth* v. *Rutledge*, 356 Mass. 499, 502 (1969). See also *Commonwealth* v. *Richardson, supra* at 352-353. Here the Commonwealth's case at trial was a dubious one, and the doubt is deepened by the fact that the triers did not have before them some evidence which tends to undermine the stories they heard.

9. *Evaluation of the evidence.* A combination of circumstances puts in question the value of the testimony of Williams and Irving.

Of several individuals present in Freeman's apartment when the defendant was alleged to have been there, none other than Williams and Irving testified to seeing the defendant. Although Williams said Freeman was on the scene and awake when he entered accompanied by the defendant, Freeman (an important witness in the Walker trial) in fact specifically testified she did not see the defendant that day.[6]

Such contradictions could more easily be passed over were it not for the fact that Williams and Irving did not hold to any one version, and in their several narratives told stories that were changing in material part, conforming for the first time at the defendant's trial. Their first four statements, made in Virginia, were wholly consistent with the defendant's innocence. Three of the four utterances pointed to a three-man crime. All four statements asserted unambiguously that a stolen car had been used, and it is not disputed that Irving stole a car the day before the crime. Yet, after being confined over a lengthy period of time in the same prison cell, the men agreed at the Walker trial that the defendant's car was used and that she drove it.

As the men departed from their early accounts, discrepancies appeared—unresolved until the defendant's trial. Thus the Virginia statements related that the gang came by to pick Williams up in the morning, and so Irving reiterated at the Walker trial. But at the defendant's trial Irving chalked up his earlier statements to mistake and agreed with Williams that the latter had come to the defendant's apartment on his own. Irving similarly ex-

---

[6] Freeman also took issue in some detail with Irving's account of the movements of Walker and himself in the morning; she testified the two left together upon Irving's arrival, while Irving said he first left Walker to buy heroin and that Walker departed with him only after a second visit.

plained as an innocent mistake his story at the Walker trial of the group stopping by Freeman's apartment just before the robbery to secure weapons. Less basic earlier inconsistencies smoothed out at the defendant's trial related to how much cash she received as her share and whether she got anything besides cash. Quite striking is Williams's testimony at both trials that only in July (the month of the Walker trial, and after Williams had implicated the defendant) did he find out that he would be permitted to plead guilty to murder in the second degree —a point which the prosecutor contradicted and about which Williams was unlikely to have been genuinely confused.

Williams and Irving emerge as very willing to lie under oath. Each has given at least three basically different accounts of the crime.[7] Their difficulties on the score of credibility could perhaps be played down if their later statements were more believable than the earlier ones, but the contrary would appear to be the case:

(a) In the original statements given to the Danville police a short time after their arrest, they freely (and separately) admitted their own involvement and Walker's, yet omitted mention of the defendant or any fourth participant. To credit their later testimony, one would have to believe the men had the wit and generosity to fabricate quickly (and jointly) a story protecting the defendant, with such supporting details as the stolen automobile and Williams being picked up.[8] We note that

---

[7] Williams in Virginia said in his second statement that an eighteen-year-old girl of light complexion drove them in a stolen car; at both trials he testified the defendant drove in her own car; his recantation said Irving was the driver. Irving testified at the Walker trial that Williams was picked up in a car driven by the defendant and all then went to Freeman's; at the defendant's trial he said he was in error on those points; his last position was that the defendant was not involved.

[8] It is also possible that Williams's story of an eighteen-year-old driver was not a fabrication; the new-trial judge may have been right to suppose that a girl was sitting in the car during the holdup and that Williams and Irving initially attempted to keep her out of trouble. But

Williams and Irving returned in their recantations to their original, and more spontaneous utterances: again they spoke of a three-man crime with a stolen car and so forth.

(b) It is not difficult to imagine why Williams and Irving might have implicated the defendant. Even discounting their claim about fearing the death penalty, the two did face first degree convictions, meaning life in prison without hope of parole. A plea in the second degree would offer a chance of parole after fifteen years—but the Commonwealth seemingly did not need the men's cooperation to convict them or Walker. As Irving was advised by counsel, only if a woman were involved might a deal be worked.

(c) The motives Williams and Irving might have for recanting are less apparent. They were duly warned at the new-trial hearing that perjury in a murder case could be punished by life imprisonment. Even if such a prosecution did not follow, they might fear the effect on a parole board of knowledge that they had either attempted to sabotage a sound Commonwealth case or had earlier tried to get an innocent woman convicted.

All this is apart from the speculation whether a mother of four in her middle twenties, recently working part time, receiving money from her father, and unimpeached by any criminal record, would likely join a band of youthful heroin users in a poorly planned crime in exchange for a meager share of the proceeds.

10. *Suppression of exculpatory evidence.* If the jury did not apprehend some of the doubts just expressed, it was perhaps because the prosecutor's failure to turn over exculpatory material, and errors of the judge therein, contributed to keeping from the jury evidence that lessened the credibility of the key witnesses. The jury knew noth-

---

the girl may well have been someone other than the defendant, and details such as the stolen automobile and how Williams was picked up may have been accurate.

ing of Irving's Virginia statements; for all they heard, Irving might never have said anything other than that the defendant drove her own car, and was a full partner in the crime. Neither defense counsel nor the jury saw Williams's signed confession, nor did they know that in the first statement no extra participant was named. Nor did counsel or the jury see Irving's statement to the Danville police with his admission of having stolen an automobile the day before the crime.

On the face of things the Commonwealth, by its failure to produce the Virginia statements favorable to the defendant, violated the rule of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), amplified in *United States* v. *Agurs*, 427 U.S. 97, 106 (1976), that suppression by the prosecution of requested material evidence which is favorable to the accused is a denial of due process. See, e.g., *Commonwealth* v. *Medina*, 372 Mass. 772, 779 n.3 (1977); *Commonwealth* v. *DeChristoforo*, 371 Mass. 26, 34-35 (1976); *Commonwealth* v. *Donahue*, 369 Mass. 943, 952-954, cert. denied, 429 U.S. 833 (1976); *Commonwealth* v. *Stone*, 366 Mass. 506, 510-511 (1974); *Commonwealth* v. *Cassesso*, 360 Mass. 570, 578 n.5 (1971), vacated on other grounds sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972). See also *Commonwealth* v. *Mains*, 374 Mass. 733, 738 (1978). The duty of course rested on the Commonwealth under the law even as it existed before we held in *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975), that a defendant should have access to witness statements without having to show particularized need. See, e.g., *Commonwealth* v. *Thompson*, 362 Mass. 382, 387 (1972), and *Commonwealth* v. *Cassesso*, *supra*, antedating the *Lewinski* decision.

There was no escape from the duty on any pretense that the statements were not favorable to the defense. On the Commonwealth's theory of the case, the defendant drove the robbers to and from the pawnshop in her own car, yet from the men's first utterances it appeared that a stolen car was used, that there was not a fourth partici-

pant, or (in one statement) that there was a girl driver much younger than the defendant and of lighter color. The trial judge's notion, supported by the prosecutor, that statements silent as to the defendant were for that reason exempt from disclosure, was surely erroneous. We observe here that material may be within *Brady* although it is not absolutely destructive of the Commonwealth's case or highly demonstrative of the defendant's innocence. The *Brady* obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.[9]

The prosecution here first registered "no objection" to producing statements as to the defendant's absence from the criminal activities, and an order was entered. Such material was not produced. When the judge appeared later to depart from the requirement by his reference to "silence," the result was simply to introduce an error of law, as indicated.[10]

The judge committed further error in invoking the rule of *Leonard* v. *Taylor*, 315 Mass. 580 (1944), by which, it was suggested, the defendant could examine material the exact content of which she did not know in advance, only on pain of rendering all or any part of it admissible at the instance of the prosecution. Whatever may be the status of the *Leonard* rule today,[11] it is totally inapplicable to a

---

[9] *Commonwealth* v. *Pisa*, 372 Mass. 590, 595 (1977), makes clear that "exculpatory" is not a technical term meaning alibi or other complete proof of innocence, but simply imports evidence "which tends to 'negate the guilt of the accused' . . . or, stated affirmatively, 'supporting the innocence of the defendant.' "

[10] Incidentally, the prosecutor successfully opposed in camera inspection by the judge of witness statements, particularly those to the Danville police.

[11] The beginnings of the *Leonard* rule help to explain its limits. See

discovery situation in a criminal case, as Justice Whittemore's opinion in *Commonwealth* v. *Marsh*, 354 Mass. 713, 721 (1968), makes clear.

11. *Materiality of the errors.*[12] *United States* v. *Agurs*, 427 U.S. 97 (1976), speaks of the circumstances in which nondisclosure of exculpatory matter should result in reversal of criminal convictions. The decision distinguishes between specific and general requests (or cases where no request is made). When there is merely a general demand, the Court's standard, designed to "reflect our overriding concern with the justice of the finding of guilt," would require nullifying a conviction "if the omitted evidence creates a reasonable doubt that did not otherwise exist . . . . This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112-113. The precise meaning of this formulation has become a lively problem for the Federal courts, but we think few would find a fact like Williams's failure to mention a fourth participant in his first statement of such trivial importance in a close case that the suppression could be easily passed over.[13] Cf. *Commonwealth* v. *Mains*, 374 Mass. 733 (1978).

---

*Commonwealth* v. *Davidson*, 1 Cush. 33, 44-46 (1848); *Clark* v. *Fletcher*, 1 Allen 53, 57-58 (1861).

That the prosecutor insisted on a *Leonard* treatment of the early statements may have heightened the fears of defendant's counsel that he would be falling into a trap if he accepted that course.

[12] As recently stated in *Commonwealth* v. *Nolin*, 373 Mass. 45, 47 (1977), citing *Earl* v. *Commonwealth*, 356 Mass. 181, 184 (1969), if prejudicial constitutional error is found, there is no discretion to deny a new trial.

[13] Because a specific request was here made, we need not examine too finely the controversies surrounding the proper response to dereliction of the over-all prosecutorial duty to disclose. It may nonetheless be noted that even the more relaxed views would point to reversal in

Thus the verdicts might be vulnerable even if only a general request had been made for exculpatory evidence.[14] But here the prosecution was left in no doubt what was wanted, if it existed. The witnesses involved were pointed to, and the subject matter (identity of the vehicle and of the robbers) specified. See *United States* v. *Mackey,* 571 F.2d 376 (7th Cir. 1978); *United States* v. *McCrane,* 547 F.2d 204, 207-208 (3d Cir. 1976). "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs, supra* at 106. In such cases, *Agurs* commands that "the reviewing judge must set aside the verdict and judgment

this case: Some courts would read *Agurs* as demanding a new trial whenever exculpatory evidence withheld after no more than a general request "might have affected the outcome of the trial." *Government of the V. I.* v. *Testamark,* 570 F.2d 1162, 1166 (3rd Cir. 1978). Others apparently think this standard too much like the harmless-error rule the Court specifically eschewed, 427 U.S. at 112, and these courts apparently require more to upset a verdict in such circumstances than any reasonable likelihood that the evidence could have influenced the jury's judgment. See *Annunziato* v. *Manson,* 566 F.2d 410, 414 (2d Cir. 1977). But all agree that in a closely balanced case reversal is required. See *United States* v. *McCrane,* 547 F.2d 204, 207 (3d Cir. 1976).

Another open question concerning nonspecific requests is whether *Agurs* demands reversal only when the omitted evidence creates a reasonable doubt of guilt in the mind of the reviewing court, or whether the court should reverse if a jury might have entertained such doubt. See *United States* v. *Oliver,* 570 F.2d 397, 402 (1st Cir. 1978); *Cannon* v. *Alabama,* 558 F.2d 1211, 1214 n.11 (5th Cir. 1977), cert. denied, 434 U.S. 1087 (1978); *United States* v. *Washington,* 550 F.2d 320, 330 (5th Cir.), cert. denied, 434 U.S. 841 (1977).

A gloss on *Agurs* not obviously deriving from anything to be found in that opinion is the Fifth Circuit's rule that where nondisclosed evidence would be useful for impeachment only and no specific request was made, the defendant must show that its inclusion more likely than not would have produced a verdict of not guilty. *Garrison* v. *Maggio,* 540 F.2d 1271 (5th Cir. 1976), cert. denied, 431 U.S. 940 (1977) (and note the powerful dissent by Wisdom, J.).

[14] "[T]he constitutional obligation is [not] measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it." *United States* v. *Agurs,* 427 U.S. 97, at 110 (1976).

unless his 'conviction is sure that the error did not influence the jury, or had but very slight effect.' " *Id.* at 112. We suppose such assurance may exist where the evidence of guilt is so overwhelming that the omission was obviously without effect, or the matter suppressed was in fact thoroughly explored (see *United States* v. *Sweet,* 548 F.2d 198, 203 [7th Cir.], cert. denied, 430 U.S. 969 [1977]), or the defendant has somehow become aware at the trial of the contents of the undisclosed material and had full opportunity to examine on it (see *Brown* v. *United States,* 556 F.2d 224, 227-228 [3d Cir. 1977]).

The present case does not fall into any of these categories. Enough has been said about the condition of the proofs. In our view there was not an inquiry at trial that could be held a satisfactory substitute for the material withheld. Nor should the defendant be considered delinquent in her pursuit of such an inquiry and therefore treated as if she had carried it out without result.

As the trial progressed the prosecutor may have had second thoughts about the exculpatory evidence in his possession. In the cross-examination of Williams, and then of Irving, he did allow counsel to hear the tapes. However the written statements were not produced: although counsel was told in the midst of Irving's cross-examination that he had not mentioned a girl participant in the first confession, it was not disclosed that the same was true of Williams; and although Irving testified that he had a stolen car in his possession, the fact that he had stolen one the very day before the pawnshop robbery was kept from defense counsel.

The prosecutor's late, piecemeal, and incomplete disclosures forced on defense counsel the necessity of making difficult tactical decisions quickly in the heat of trial.[15] Thus it was only after the jury had heard Wil-

---

[15] The following summary of major facts will illustrate the gaps in the knowledge of defense counsel and jury, and the tardiness of counsel's discovery of vital details:

liams's tape recorded reference to an eighteen-year old girl that counsel discovered that Irving mentioned no such driver.[16] Counsel had then to decide whether it was worthwhile pushing a cross-examination of Irving on the inconsistency, and the decision had to be made without knowledge of the full content of Irving's still unproduced statement to the Danville police. In retrospect, it may be thought that counsel did not use to maximum advantage those parts of the story he did finally secure out of the prosecutor's possession. But the defendant should not be

1. That statements were made in Virginia to members of the Boston police force.

    Defense counsel found this out only during cross-examination of Williams and Irving; and only then did counsel learn of the existence of the taped statements.

2. That Williams did not name the defendant in either of his Virginia statements.

    This first came out on cross-examination of Williams.

3. That Williams did not name any fourth participant in his first statement.

    Neither counsel nor the jury knew this.

4. That Williams's two Virginia statements said a stolen car was used.

    This first came out on cross-examination.

5. That Irving's two Virginia statements mentioned neither the defendant nor any fourth participant.

    Counsel found this out in a bench conference during Irving's cross-examination; the jury never learned of this.

6. That Irving said in his first statement that he had stolen a car on November 29 (the day before the robbery).

    Neither counsel nor the jury knew this (although they did know he had a stolen car).

[16] The prosecutor put on the record at a bench conference during Irving's cross-examination that he had informed defense counsel the day before of Irving's omission of any girl. We cannot determine whether that private meeting of counsel took place before or after Williams completed his testimony and the jury heard the tape.

held to a strict standard in order to patch over the prosecution's conduct.[17]

> *Judgments reversed.*
> *Verdicts set aside.*

---

[17] There are two other claims of error that may become relevant on retrial: (a) The defendant asserts that the prosecutor—after putting on record at the Walker trial that the Williams plea bargain was made in April—allowed Williams to testify falsely that he first had knowledge of the deal in July. But defense counsel made no attempt to bring the discrepancy to the attention of the judge. At a new trial we would expect the prosecution to respond to a renewal of this questionable testimony as it did at the Walker trial. (b) The judge excluded testimony of the defendant's father that he had told her he was ready to give her money in reasonable amounts if she needed it. There were in evidence, however, seventeen receipts of money orders her father had sent her. We think the testimony, although perhaps not of great value, should have been permitted as tending to show the defendant had no motive for robbery. See *Commonwealth* v. *Cooper*, 264 Mass 368, 376 (1928), citing *Regina* v. *Grant*, 4 F. & F. 322 (Crown Ct. 1865); 2 J. Wigmore, Evidence § 392, at 343 (3d ed. 1940) ("the fact that a person was in possession of money tends to negative his desire to obtain it by crime . . . and is always admissible"). See also *Commonwealth* v. *Reynolds*, 338 Mass. 130, 133-134 (1958) (evidence defendant had money should be admitted to rebut Commonwealth's case concerning motive).