IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 29, 2005

## STATE OF TENNESSEE v. BRUCE E. OLSON

**Appeal from the Circuit Court for Sevier County**
**No. 10151-II     Richard R. Vance, Judge**

---

**No. E2005-00663-CCA-R3-CD - Filed January 23, 2006**

---

A Sevier County Circuit Court jury convicted the defendant, Bruce E. Olson, of rape of a child, a class A felony, and the trial court sentenced him to serve twenty years at one hundred percent in the Department of Correction. On appeal, the defendant claims that the evidence was insufficient, that the trial court erred in not excluding the defendant's statement to police based upon the state's delay in providing him a redacted copy, and that the state violated his right to due process by withholding exculpatory evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellant, Bruce E. Olson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the defendant and his accomplice exchanging cigarettes for sex with the victim, an eleven-year-old boy. At the trial, Carmen Cate testified that she was the victim's mother. She said she and her husband were the owners of Hillside Mobile Home Park, which was located behind their house. She said she knew the defendant because he and his family lived in one of the mobile homes. She said the defendant essentially grew up with her children. She said she knew the co-defendant, Charlie Collins, because his brother, Denver Collins, rented a trailer from her and her husband. She said that until the day of the crime, she had never had trouble with the defendant or the co-defendant.

Ms. Cate testified that on the day of the crime, she had been in Atlanta visiting her mother. She said that when she arrived home that evening, she began making dinner and heard her husband in the living room talking to her son, the victim, about smoking. She said that as a result of this conversation, she learned that her son had been smoking cigarettes and marijuana given to him by the defendant and the co-defendant.

Ms. Cate said she and her husband looked for the defendant and co-defendant and found the co-defendant at one of the mobile homes. She said that they asked the co-defendant to come outside and that he came outside. She said that she slapped the co-defendant a few times and that he said "I'm sorry, I'm sorry." Ms. Cate said that her husband then struck the co-defendant once, that the co-defendant "balled up," and that she began to kick him. She said she told the co-defendant to vacate her property and not to return.

Ms. Cate testified that when she returned home, she found the victim in a fetal position, crying. She said that she asked the victim what was wrong and that he responded, "They made me put their dicks in my mouth." Ms. Cate said the victim told her it happened at Denver Collins' house. Ms. Cate said that she asked the victim why he had returned to Denver Collins' house after this took place and that the victim responded, "I wanted to ask [the defendant] why he did this to me." Ms. Cate said her husband was outside talking to the defendant during this time. She said she called the police.

Ms. Cate testified that as a result of her son's statement, she took him to the hospital. She said the hospital performed tests, including blood tests and throat swabs. She said the results of the tests were negative for diseases.

On cross-examination, Ms. Cate admitted that she considered her assault on the co-defendant to constitute "a beating." Ms. Cate said that after his initial statement, the victim refused to discuss the incident with her, her husband, or a counselor. Ms. Cate acknowledged that this incident was not the first time she had caught the victim smoking and that she did not know from whom the victim had been getting his cigarettes. Ms. Cate admitted that the victim did not always tell the truth when confronted with his smoking, stating, "I'm not going to sit here and tell you he doesn't lie." Ms. Cate admitted all of the tests performed at the hospital were negative.

Randy Cate testified that he was the victim's father. He said he was questioning his son after his wife returned from Atlanta. He said his eleven-year-old son told him the defendant and co-defendant gave him some cigarettes. He said he went looking for the co-defendant. He said that after his wife finished assaulting the co-defendant, he "hit him about 20 times on top of the head." He said he nearly broke his hand assaulting the co-defendant. He said that although he did not beat the co-defendant into unconsciousness, the co-defendant "was probably seeing three of [him]." He said that after assaulting the co-defendant, he began to look for the defendant when he heard a rumor. He said that as a result of the rumor, he went back home to speak to the victim who told him that the defendant and co-defendant made the victim perform oral sex on them.

Mr. Cate testified that he went outside looking for the co-defendant. He said that when he found the co-defendant inside one of the mobile homes, he told the co-defendant and the woman who lived in the mobile home that he was not there to start any problems and that he only wanted the truth. He said that he asked the co-defendant if he made the victim perform oral sex and that the co-defendant replied that he had. Mr. Cate said he called the police.

On cross-examination, Mr. Cate admitted he had told the victim that if the victim did not tell the truth about smoking, he was going to sell the victim's motorcycle. He acknowledged that the victim did not always tell the truth. Mr. Cate admitted the co-defendant told him what he wanted to hear. Mr. Cate said no test performed at the hospital revealed evidence of a rape. Mr. Cate acknowledged that when he returned home from beating the co-defendant, the victim knew he would probably get "a pretty good whipping" for smoking. Mr. Cate said, however, that he "sort of dropped the pot after [he] found out about [the rape]."

The victim testified that he knew the defendant and co-defendant because they lived in the mobile home park. He said he had known the defendant for seven years and the co-defendant for two. He said he considered the defendant and co-defendant to be his friends. He said that on the day in question, he went to Denver Collins' house where the defendant and co-defendant were watching television. He said that he sat down and watched television with them and that no one else was in the mobile home. He said he smoked cigarettes and marijuana which the defendant and co-defendant provided. The victim said the co-defendant then got partially undressed. He said that he wanted another cigarette and that the co-defendant told him "Come over here . . . give me a blow job, I'll give you a cigarette." He said he was already sitting next to the co-defendant who then pushed his head down onto the co-defendant's penis. He said the co-defendant's penis went into his mouth for ten to fifteen seconds. The victim said the defendant, who was sitting on the other side of him, then pushed his head down onto the defendant's penis. He said the defendant's penis was in his mouth for about five seconds. He said the defendant and co-defendant told him they would kill him if he told anybody.

On cross-examination, the victim said that he was only at the Collins' home for about thirty minutes and that no one else was there during that time. He said he did not remember whether the defendant or the co-defendant gave him the marijuana. The victim admitted that he did not tell the truth about smoking until his dad threatened to sell his motorcycle. The victim said he did not tell his dad about the marijuana at first because he knew he would be in more serious trouble. The victim said that he was able to see the co-defendant's penis and that there was nothing unusual about it. The victim said he did not know what a "circumcised" penis was. He said the co-defendant's penis was not hard when it went into his mouth.

Sevier County Sheriff's Department Detective Mark Turner testified that he investigated the rape. He said that as a part of his investigation, he conducted a tape-recorded interview with the defendant. He said the defendant told him that the victim had put the defendant's penis in his mouth, keeping it there for only one second before the defendant pushed the victim away.

On cross-examination, Detective Turner testified that he was aware that the victim was taken to the hospital and given a medical examination. He admitted that he spoke with the doctor who performed the tests and that "there was no evidence that [the doctor] could find of this occurring." Detective Turner said the evidence from the hospital was not preserved.

On redirect-examination, Detective Turner testified that he did not expect to find any evidence of the sexual assault in the victim's mouth. He said he based his expectation on the fact that the victim did not mention either the defendant or the co-defendant ejaculating in his mouth.

Aaron Doll testified that on the day in question, he was watching a movie with the defendant, the co-defendant, and the victim. He said that the co-defendant was in his presence the entire time but that the defendant and the victim were not. Mr. Doll said that although the victim asked everyone for a cigarette, no one gave a cigarette to him. Mr. Doll admitted he, the defendant, and the co-defendant were smoking marijuana. He said, however, that he neither saw nor heard anything relating to sexual conduct. Mr. Doll said that after the movie was over, the victim left.

On cross-examination, Mr. Doll said the defendant left to go to his sister's house but returned in ten or fifteen minutes. He said that no one went with the defendant. Mr. Doll acknowledged that he did not know what happened before he arrived or after he left.

The victim was recalled to the stand. He testified that he discussed the case with Denver Collins on one occasion. He denied telling Mr. Collins that the defendant and co-defendant had not done anything to him.

Denver Collins testified that the co-defendant was his brother. He said he spoke with the victim about the incident. He said the victim told him that the defendant and co-defendant "didn't do nothing." He said he believed the victim had accused the defendant and co-defendant of raping him because they would not give him a cigarette.

On cross-examination, Mr. Collins acknowledged that on the weekend in question, he was out of town. He admitted never telling the police or the district attorney's office about the victim's statement to him. He explained that he did not report this statement because the police had threatened to put him in jail. He said he was "not going to talk to no cop that's going to threaten to put me in jail." Mr. Collins said only he and the victim were present when the victim told him the defendant and co-defendant did not rape him.

The co-defendant testified that he was watching the movie Too Fast, Too Furious with the defendant and the victim at his brother's house. He said the victim was asking for a cigarette as he normally did. He said that when the victim asked for a cigarette, he normally would say, "I'll give you a blow job." The co-defendant said the victim's language struck him as inappropriate and unusual for an eleven-year-old boy. He said he and the defendant told the victim that if he did not stop asking for something to smoke, they were going to tell the victim's parents. The co-defendant admitted that on the day in question, he and the defendant were smoking cigarettes and marijuana.

-4-

He said that he did not have sexual contact with the victim and that he did not see the defendant have sexual contact with the victim. He said his penis was unusual because it was uncircumcised. The co-defendant denied admitting to the victim's father that he raped the victim.

On cross-examination, the co-defendant admitted giving the victim cigarettes but denied giving him marijuana. The co-defendant acknowledged he had previously told Detective Turner that he had given the victim marijuana. He explained, however, that there was marijuana in a pipe, that the victim began smoking the pipe, and that he did not stop the victim. He said that by not stopping the victim, it could be said that he gave the victim marijuana. The co-defendant denied asking the victim for a blow job.

Based upon the foregoing evidence, the jury convicted the defendant of rape of a child. On appeal, the defendant contends that the evidence is insufficient, that the trial court erred in not suppressing the defendant's statement based upon the state's failure to disclose a redacted copy of the statement timely, and that the state withheld exculpatory evidence. The state responds that the evidence is sufficient and that the trial court properly denied the defendant's motion to exclude the redacted statement. It claims that the defendant has waived the issue involving the state withholding exculpatory evidence and that, in any event, the evidence was made available to the defendant.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence is insufficient. He claims that the testimony of the victim and his parents was biased and wholly unreliable and that the medical tests performed at the hospital were devoid of physical evidence supporting the victim's claim. The state contends the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Tennessee Code Annotated section 39-13-522 provides that rape of a child "is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

At the trial, the victim testified that the defendant forced him to place his mouth on the defendant's penis, and Detective Turner testified that the defendant confessed to allowing the victim to perform oral sex on him. We conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty of rape of a child beyond a reasonable doubt, and the defendant is not entitled to relief on this issue.

## II. FAILURE TO EXCLUDE DEFENDANT'S REDACTED STATEMENT

The defendant contends the trial court erred in failing to exclude his redacted statement based upon the state's prejudicial delay in disclosing to him a copy of the redacted statement. The state contends the trial court did not err. We agree with the state.

In denying the defendant's motion to exclude, the trial court found that the state had not failed to provide the defendant a redacted copy of his statement. The following exchange is relevant to this issue:

> [Defendant's attorney]: Obviously the defense needs to object, that the Court directed the State to provide this at least 24 hours ago, if not more. There are some things in recent case law about which we might could have researched had we known exactly what the State intended to present.
>
> Certainly we need to object, for the record, and we'd argue the State shouldn't be allowed to use this statement. But at the very least we need to preserve our objection for the record.
>
> The Court: Court will take judicial knowledge that yesterday morning–it's on the record–that [the assistant district attorney general] was here, was here all day, had those redacted statements to present to defense counsel. . . . So your objection on that basis is overruled.

We conclude the state did not violate the trial court's order to disclose to the defendant a redacted statement of his confession twenty-four hours before the trial. The defendant is not entitled to relief on this issue.

## III. FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

The defendant contends the state violated the rule announced in Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), by not disclosing the results of medical tests. He claims the tests were inconsistent with the victim's claim of rape, thereby constituting exculpatory evidence required to be disclosed under the edicts of Brady. The state claims the defendant has waived this

issue for failure to object at the trial after learning about the existence of the medical tests and that in any event, it did not suppress the evidence.

The record reflects that after learning about the negative results of the medical tests, counsel for the co-defendant objected and the trial court asked the attorneys to approach the bench. Co-defendant's counsel explained his objection was based upon a Brady violation, claiming the state failed to disclose any evidence regarding medical tests performed on the victim, and he asked the trial court to declare a mistrial. During the discussion, the defendant's attorney participated in the discussion, arguing on behalf of the co-defendant's objection, which the trial court overruled. We believe that the defendant did not waive this issue.

In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97. In order to establish a due process violation under Brady, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Brady does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

This court has stated that in order to establish a Brady violation, the information need not be admissible, only favorable to the defendant. See State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes

> "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness."

Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 376 Mass. 1, 22, 379 N.E.2d 560, 571 (1978)). This court will deem evidence material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. See United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). A "reasonable probability" is "'a probability sufficient to undermine confidence in the outcome.'" Id. at 682, 105 S. Ct. at 3383 (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)). In the context of Brady, "once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review." Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995).

In overruling the motion for a mistrial, the trial court stated:

> This officer's testified that he talked to the doctor. He did not receive reports, he did not receive evidence. Whatever examinations were performed were performed at the hospital by the hospital. Those records are available to either party by subpoena. That information, from what I have heard, that this young man went to the hospital, was examined at the hospital.
>
> The State has provided no test results because the State doesn't have any test results. Those test results, whatever they are, are available to either side by subpoena.

Initially, we note the record reflects that the state had provided both defendants "open file discovery" in this case. However, on appeal, the record is devoid of what evidence was actually disclosed to the defense. In this regard, we note that the defendant failed to introduce into the record at the trial or motion for new trial hearing any evidence in the form of affidavit, testimony, or otherwise alleging the state suppressed the results of the tests. We conclude the defendant has failed to prove by a preponderance of the evidence that the state suppressed the results of the medical tests, and he is not entitled to relief on this issue.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

JOSEPH M. TIPTON, JUDGE

-8-