# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 16, 2014

# STATE OF TENNESSEE v. DEAUNDRA DONNELL SMITH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-2006      Monte Watkins, Judge**

_____

**No. M2013-02247-CCA-R3-CD - Filed June 5, 2015**

_____

A Davidson County jury convicted the Defendant, Deaundra Donnell Smith, of first degree felony murder and especially aggravated robbery. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred when it denied his motion for mistrial based upon the State's alleged failure to disclose exculpatory evidence; and (3) the trial court erred when it failed to admit into evidence a text message sent from one of his co-defendants to the other co-defendant. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Jason Chaffin, Nashville, Tennessee, for the appellant, Deaundra Donnell Smith.

Herbert H. Slatery III, Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the robbery and shooting of the victim, Corey Sanders, which occurred in September 2007. For these crimes, a Davidson County grand jury indicted the Defendant for felony murder and especially aggravated robbery. At the Defendant's trial on these charges, the following evidence was presented: Jessica Haines testified that in September 2007 she was living with the victim, to whom she was engaged, at a house on

Highland Drive in Nashville, Tennessee. Through the victim, she knew a man named Devonta Cunningham, and she referred to him as "Papa." Mr. Cunningham had been to their home on a few occasions, and he was at their home accompanied by "a couple of gentlemen" on the Friday before the shooting in this case. Mr. Cunningham came to their home to look at dogs that Ms. Haines was selling.

Ms. Haines testified that Mr. Cunningham brought dogs with him when he came. She remembered having to restrain one of her dogs from attacking Mr. Cunningham's dogs. At that time, Ms. Haines was in the backyard, where she stayed for the duration of Mr. Cunningham's forty-five-minute visit. Ms. Haines recounted that, while she was in the backyard, the victim's cousin, Casey, stopped by. Casey gave the victim fifteen one hundred dollar bills for the victim's motorcycle and then an additional $500 for the victim's riding gear that matched the motorcycle. Mr. Cunningham was present when Casey gave the cash to the victim.

Ms. Haines described the events that occurred on September 29 and 30, 2007. She said that a man called the victim's cell phone late on the night of September 29 and asked to speak with the victim. She told the man that the victim was asleep. A few seconds later, Mr. Cunningham called the victim's cell phone and identified himself, and she recognized his voice. Ms. Haines said that she "fussed with [Mr. Cunningham] a little bit," but she ultimately woke up the victim and gave him the phone. She overheard Mr. Cunningham tell the victim that he needed "three of them." Ms. Haines understood Mr. Cunningham to be asking to purchase marijuana. After speaking with Mr. Cunningham, the victim got up from bed and dressed. He went into the kitchen, and Ms. Haines followed him. The victim asked Ms. Haines if she wanted to come outside with him and swing on the porch swing. Ms. Haines said yes and that she would be there in a minute. The victim went outside.

Ms. Haines described what happened next by saying, "[I]t was like fireworks." At first she heard three shots, and then two more. Her instinct was to get up and run to the window to see what was happening. She did not see the victim, but she saw a man running just outside the fence in their yard. The man got into a car beside which two other individuals were standing. The car then sped away. She recognized the car as the Thunderbird in which Mr. Cunningham had come to her home on the previous Friday. Ms. Haines said that the man who was running by her fence had "dreadlocks" and got into the back seat of the car. The man who was driving and had been standing by the car was the "tallest one." Ms. Haines testified that all three individuals were African-American.

Ms. Haines testified that, when the car sped away, she went outside and found the victim lying face down in the grass. He had blood coming from the back of his shirt. She could not flip the victim over on her own, and a neighbor came to assist her. The neighbor

2

rolled the victim over and began administering CPR. Ms. Haines noticed that the victim's pockets had been turned inside out and that there was no money in them. Ms. Haines called the victim's mother, who was nearby, and both women remained with the victim until an ambulance arrived.

Ms. Haines testified that police arrived and asked her which way the shooters went. Ms. Haines showed them the direction taken by the Thunderbird. Other officers then interviewed her while the victim was taken by ambulance to the hospital. Ms. Haines said she was in "shock" during the interview, and she wanted to be at the hospital with the victim. She did not get to go to the hospital until after she learned that the victim had died.

Ms. Haines said that she did not find any money in the house after the victim died, and she knew that he did not have a bank account. Ms. Haines testified that she also could not find the victim's cell phone, which the two had purchased two months before his death. Ms. Haines said she provided the police the box that came with the phone.

Ms. Haines testified that she identified Mr. Cunningham in a photographic lineup shown to her by detectives. It was not until later that she learned his name was Devonta Cunningham. Ms. Haines said that she initially told the police that she believed that Mr. Cunningham had called about the puppies on September 30, 2007, but later during the same interview she told the police that he had called about marijuana.

During cross-examination, Ms. Haines confirmed that there were two phone calls to the victim's cell phone on the night of the shooting. The first phone call was from a voice that she did not recognize, and the second was from Mr. Cunningham, whom she recognized by voice and who identified himself. Ms. Haines said that the victim did not have Mr. Cunningham's phone number saved in his cell phone because Mr. Cunningham had previously called from "numerous" numbers.

Ms. Haines said that she had worked during the evening of September 29, 2007, at the police department from 3:00 p.m. until 11:00 p.m. She went and got her son and then arrived home around 11:40 p.m. She estimated that the first phone call came in after midnight. The two phone calls were received close together, and the victim went outside shortly after the phone calls. Ms. Haines estimated that the shooting occurred at around 1:00 a.m. on September 30, as she was preparing to go to sleep. Ms. Haines heard the shooting and ran to the window where she saw an African-American man with a "short haircut" exiting the yard and going toward the car. She saw the driver outside of the car, standing beside the driver's side door. He was "tall and slim."

Ms. Haines agreed that, in September 2007, she did not know the names "Deaundra Smith," "Ashton Gaines," "Mychal Hendricks," "Lance Featherston," "William Gentry Davis," or "Devonta Cunningham." She only knew "Papa" by his nickname, which was how he described himself.

Lisa White, the victim's mother, testified that she stayed with her grandmother on the weekends to "take care of her." Ms. White's grandmother lived "three doors up from" her home at 2912 Highland Drive, which was where the shooting in this case occurred. Ms. White said that the victim, Ms. Haines, and Ms. Haines's son lived with her in her home at 2912 Highland Drive, but she was not present on the evening that the shooting occurred, as she was staying with her grandmother, three houses away.

Ms. White testified that, the evening of the shooting, she heard a "loud sound." She said that she went back to sleep but was awakened a short time later by her grandmother, who was telling her that something bad had happened to the victim. Ms. White got out of bed, dressed, and went down the street where she saw the victim on the ground near her house. A neighbor was performing CPR on the victim, and there were multiple people standing nearby. Ms. White said that she discovered that the victim had been shot, and he was taken by ambulance to a nearby hospital. Ms. White met the victim at the hospital and was there with him when he died.

Yolanda Coleman testified that she was living at 2911 Highland Drive on the date of this shooting and was fifteen or sixteen years old at the time. She was friends with the victim's younger sister, Talisha. Ms. Coleman said that, at the time of the shooting, she was across the street, outside, sitting at the end of her driveway talking on her telephone to her friend, "Terrance." Before the shooting, Ms. Coleman saw between two and three[1] African-American men get out of a car in front of the victim's home. They approached the victim's fenced-in yard. She heard between three and six gunshots and saw the victim fall back after he had been shot. The men then ran back to their car, got in, and drove away "fast." Ms. Coleman could not recall the make, model, or color of the car, saying that it was dark.

Ms. Coleman testified that, after the shooting, she went back inside her home and told her parents what she had seen. She said that police came to her school to ask her if she could identify anyone from the pictures, and she identified "Ashley Gaines" as someone that she had seen "around school," but she could not identify anyone in the pictures as being involved in the shooting. She told police officers that one of the men involved in the shooting had

---

[1]Ms. Coleman originally testified that four to six men exited the vehicle. After listening to her previous statement to police, she changed her testimony to between two to three men that exited the vehicle.

"dreads" and a "dark shirt," and this man went to the driver's side of the vehicle after the shooting.

During cross-examination, Ms. Coleman testified that she saw two to three men get out of the car, go over to the victim's fence, and begin talking with him. She did not notice at that time if anyone remained inside the car. She explained that because the streetlight near her at the time was not illuminated, she did not see anyone specifically. Ms. Coleman said she recognized the Defendant's face, but she did not know him and could not say that he was present at the shooting. Ms. Coleman said that, when the men approached the fence, they were there longer than a few minutes, but she was unsure how long they stood there speaking with the victim before the shooting. Ms. Coleman said she did not hear fighting before the shooting.

Dammeion Beamon testified that, at the time of this shooting, he lived across the street and two houses down from where the shooting occurred on Highland Drive. Mr. Beamon testified that he was standing at the door of his house preparing to leave when he saw a "dark blue, two-door Cougar . . . or Thunderbird" pull up to 2912 Highland Drive. He saw an African-American male dressed in dark clothing exit the vehicle. At that time, there was a white male on the porch of the home who was talking on his phone, and Mr. Beamon could see the light from his telephone illuminated. He noticed that the man on the porch walked to the gate to meet the man from the car, and the two started talking. Mr. Beamon then turned around and began speaking with someone.

Mr. Beamon testified that, shortly thereafter, he heard two gunshots. He stepped back from his glass door and saw two African-American men running to the car. One of the men had on a white T-shirt, was "short and kind of stocky," and he ran to the driver's side of the vehicle. The other man was "tall" and wearing dark clothing, and he ran to the passenger's side of the vehicle.[2] They both "jumped" into the car, and the car sped away. Mr. Beamon said that he then heard two to three more shots after the car had pulled off, and he saw the victim lying on the ground.

Mr. Beamon testified that, after the shooting, a woman with a child came out of the house. She was crying and asking for help. Mr. Beamon said that he ran, jumped the fence, which was "locked" or "shut," and started giving the victim CPR. Mr. Beamon said the victim was not responding and was having trouble breathing. Mr. Beamon noted that the victim had been shot in the lung but was not bleeding externally.

---

[2]Mr. Beamon originally testified that the man in the white T-shirt ran to the passenger side and that the man in dark clothing ran to the driver's side. After listening to his statement to police, however, he recalled that it was the opposite.

During cross-examination, Mr. Beamon testified that, in the statement he gave to police hours after the shooting, he told the police that the victim had been on the porch talking on his telephone for between thirty and forty minutes. He agreed that he did not hear the victim and the men argue before the shooting. He said that the men who arrived in the car did not go inside the fence, and the fence was still closed when he went to render aid to the victim.

Jack Stanley, a detective with the Metropolitan Nashville Police Department, testified that he was dispatched to the shooting in this case. Detective Stanley testified that, when he arrived at the scene two to three minutes after the call, he saw the victim, who appeared to be shot, lying in the front yard. The detective noted that the victim's eyes were fixed and he did not appear to be breathing, so the detective assumed he was deceased. He began asking witnesses for descriptions, and they told him that they had heard between four to five gunshots and that the shooters left in a blue or black Thunderbird. Detective Stanley testified that he broadcast over the police radio a description of the vehicle. The detective remained at the scene while it was processed by other personnel.

Ashton Gaines, known as "A.G." to his friends, was twenty-four at the time of trial. He testified that he had been incarcerated since October 9, 2007, for charges of felony murder and especially aggravated robbery stemming from this shooting. He said that he knew the Defendant because the two went to high school together. Mr. Gaines testified that the night of September 29, 2007, he and a few friends had been invited to "a house party" in Mount Juliet. Those men were: Lance Featherston; William Gentry Davis, who was known as "Flame"; Mychal Hendricks; Devonta Cunningham, who was known as "Papa;" the Defendant, who was know as "Dray;" a man referred to as "Hootie;" and a man referred to as "Hammer." Shortly after the group of men arrived at the party, the Mt. Juliet Police arrived and told them that they had to "bring the party inside." The people attending the party went inside the garage. Ten to fifteen minutes later, the person hosting the party informed them that the party was over. The group of men, who were traveling in two separate vehicles, went outside and "chilled around the car." Mr. Gaines recalled that he was driving one of the vehicles, a dark green Thunderbird. Riding with him were "Hammer," Devonta Cunningham, and William Davis. The Defendant was driving the other vehicle, a gray Chevy Caprice, and the other men rode with him. The men eventually left the location of the party and went to a McDonald's restaurant in Mt. Juliet.

Mr. Gaines testified that they stayed at the McDonald's for approximately one hour, and some of the men purchased and ate food. Mr. Gaines identified a video from the McDonald's that showed the men in their clothing that evening. Mr. Davis was wearing a green hat and a yellow shirt. Mr. Hendricks was wearing a white T-shirt. Mr. Featherston

was wearing a green jacket. The Defendant was wearing a "darker T-shirt." Mr. Cunningham was wearing a camouflage jacket, and Mr. Gaines was wearing a white hat and a white jacket.

Mr. Gaines said that the men spoke with several people by telephone. They then decided to return to Nashville. Both cars traveled to a location where they dropped off "Hammer" and "Hootie." They then went to the home of Mr. Featherston, who was Mr. Gaines's cousin. There they talked and watched television. Mr. Gaines estimated that they stayed at Mr. Featherston's house for approximately one hour before deciding to go to the "after hours club." Mr. Featherston changed clothes, and Mr. Gaines mentioned purchasing marijuana to Mr. Featherston and Mr. Hendricks. The three men went outside where Mr. Cunningham and the Defendant were waiting. They asked them if they knew anyone who sold marijuana. Mr. Cunningham said that he "might."

Mr. Gaines said that the men left Mr. Featherston's house and went toward the interstate. Mr. Davis rode with Mr. Gaines, and the other men, Mr. Hendricks, Mr. Cunningham, and Mr. Featherston, rode with the Defendant in his vehicle. Mr. Cunningham called Mr. Gaines and told him that he was going to attempt to call the victim about the marijuana. Mr. Gaines continued to follow the Defendant, but he was familiar with where they were going because he had dropped Mr. Cunningham off at the victim's residence one time before. Mr. Gaines said that the Defendant stopped a few streets from the victim's house. Mr. Cunningham and the Defendant exited the vehicle, as did Mr. Gaines. Mr. Cunningham asked to use Mr. Gaines's phone, and he handed the phone to the Defendant and gave the Defendant the victim's phone number to call. Mr. Gaines heard the Defendant ask to speak to the victim, and then he noted that the phone call ended and the Defendant hung up the telephone.

Mr. Gaines testified that the Defendant gave the telephone back to Mr. Cunningham, and Mr. Cunningham dialed the telephone again. He spoke into the telephone, identified himself as Mr. Cunningham, and asked to speak to the victim. Mr. Cunningham asked the person on the telephone, who Mr. Gaines assumed was the victim, about buying marijuana. The phone call ended, Mr. Cunningham gave Mr. Gaines his telephone, and Mr. Gaines returned to his car. The Defendant walked to Mr. Gaines's car, where he collected money from Mr. Gaines and Mr. Davis for the purchase of the marijuana. Mr. Gaines said that the Defendant walked toward Mr. Cunningham, and the two continued to have a conversation. Mr. Gaines overheard Mr. Cunningham tell the Defendant that the Defendant could rob the victim.

Mr. Gaines said he asked Mr. Davis if he had heard Mr. Cunningham tell the Defendant that they could rob the victim. Mr. Davis responded negatively, and Mr. Gaines

7

told him what he had heard. Mr. Gaines then got a plastic bag from his car and placed it over his license tag so that his car would not be identifiable in the event there was a robbery. He also went over to the Defendant's vehicle and asked Mr. Featherston whether he heard Mr. Cunningham tell the Defendant that he could rob the victim.

Mr. Gaines testified that the Defendant then entered his car, the Thunderbird, and told Mr. Gaines that the Defendant was going to ride with him. The Defendant got into the passenger's seat, and Mr. Davis sat in the back of the vehicle. The Defendant informed Mr. Gaines that Mr. Cunningham was going to drive the Defendant's car and meet them in Shelby Woods "after." Mr. Gaines said that he drove, following Mr. Cunningham, who was driving the Defendant's car. Mr. Cunningham went straight, and Mr. Gaines turned onto the victim's street.

Mr. Gaines testified that, before he reached the victim's house, he called the victim to confirm that the victim was outside, and the victim responded that he was. Mr. Gaines then pulled up to the victim's house, parked in front, and shut off his car. Mr. Gaines noted that there was a girl, whom he recognized from school, sitting in the driveway opposite the victim's house, and she was talking on her telephone. The Defendant exited Mr. Gaines's car, went to the fence that divided the yard from the street, and began speaking with the victim. Mr. Gaines testified that he saw the victim give the Defendant a "bag of weed." The Defendant then approached the open window of the passenger side of the car with the marijuana for Mr. Gaines's inspection. Mr. Gaines declined to do so, indicating that it was fine and that he did not need to look at it.

Mr. Gaines said that, at this point, the Defendant went back to the fence and reached into his pocket and pulled out some money. The Defendant then reached in his pocket again and pulled out a .357 revolver. The victim put his hands up, and the Defendant told the victim to give him the money that was in the victim's pockets. The victim reached into his pockets and gave the Defendant the contents of his pockets.

Mr. Gaines testified that Mr. Davis then exited the vehicle and stood by the front passenger's side door watching. Mr. Gaines testified that there was another .357 revolver gun in the backseat and not operable at the time. He said Mr. Davis did not have this gun in his possession when he exited the vehicle at the victim's house. Mr. Gaines said that he heard the victim say, "I ain't got nothing else," and the Defendant put what the victim had given to him, which appeared to be more marijuana, into his own pockets. The Defendant then shot the victim three times in the chest area. Mr. Gaines said that there was no arguing or fighting before the gunshots.

Mr. Gaines said that he started his car and pulled away at a high rate of speed. The Defendant told him to "calm down" and to "turn [his] lights on." Mr. Gaines said that he heard two more gunshots, and he saw the Defendant with his hand out the window. The Defendant then directed him to Shelby Woods where Mr. Cunningham would be waiting for them. The Defendant told Mr. Gaines to stop at an abandoned house near the park and indicated that he should leave his vehicle there. Mr. Gaines got out of his car and paced back and forth. The Defendant walked into the park and was gone for a short period of time. Mr. Gaines realized the bag was still over his tags, so he removed the bag. After the Defendant returned, he said that the men should begin walking toward Shelby Woods. As they were walking, Mr. Cunningham called him and said that he was parked at Tom Joy Elementary School. Mr. Gaines relayed this information to the Defendant, who then told Mr. Gaines to go retrieve his car and pick them up.

Mr. Gaines testified that he went back to his car, picked up the Defendant and Mr. Davis, and took them to Tom Joy Elementary. Once there, he saw the Defendant's vehicle parked, and he parked close to it. The Defendant exited the vehicle and told everyone present that he had robbed the victim and that he had to shoot him. The Defendant then gave Mr. Gaines some of the money and some of the marijuana. He also gave Mr. Featherston some of the marijuana.

Mr. Gaines said that he then offered to take Mr. Featherston home. The Defendant told Mr. Gaines that he would take Mr. Featherston home. He told Mr. Gaines to go directly home and park his car. Mr. Cunningham told Mr. Gaines that he would ride with him and that Mr. Gaines should drop him off first.

Mr. Gaines testified that he dropped off Mr. Cunningham and then went home. The Defendant called him to check on him, asking if he was "all right." Mr. Gaines said he told the Defendant that he was "all right" and that he was "just chilling and sitting at home" to try to take his mind off the events. The Defendant asked Mr. Gaines if he would still like to go out that evening, and Mr. Gaines indicated that he would. Mr. Gaines said that he changed clothes, and the Defendant picked him up. In the car with the Defendant were Mr. Featherston, Mr. Davis, and Mr. Cunningham. The men proceeded to a club in Nashville called "Faded, [A]fter [H]ours." They stayed at the club until closing time, which was "[a]round sunrise. Around five . . . or six" in the morning.

Mr. Gaines said that he and Mr. Davis had met up with some women at the nightclub who were in college in Kentucky. After the Defendant dropped Mr. Gaines off at his home, he drove to Mr. Davis's home and met the women from Kentucky. Mr. Gaines said he and Mr. Davis followed the women to Kentucky to spend the night with them. During that time, Mr. Featherston texted Mr. Gaines and informed him that he had seen a news story about the

shooting. Mr. Gaines said he and Mr. Davis stayed in Kentucky for a few more hours and then returned to Mr. Davis's house in Nashville. Mr. Featherston met them there and smoked some of the marijuana that they had taken from the victim.

Mr. Gaines testified that he did not see the Defendant until a couple of days later. The Defendant told him that he had spoken with the people involved in the incident and that, if police asked questions about the incident, they were to say what happened that day and evening but omit only the part about going to the victim's house. Mr. Gaines said that he agreed to this plan.

Mr. Gaines testified that he first spoke with Detective Hafley about this shooting on October 9, 2007, when the detective came to interview him. He told the detective the story that he and the Defendant had discussed and did not, at that point, tell the detective the truth about the events surrounding the shooting. He then spoke with the detective again on October 10, maintaining the same story. Mr. Cunningham called him later that evening and started asking him questions. He asked him the location of the gun that was used to shoot the victim. Mr. Gaines responded that he did not know what Mr. Cunningham was talking about.

Mr. Gaines testified that, while he was on the telephone with Mr. Cunningham, the Defendant called on the other line. Mr. Gaines put Mr. Cunningham on hold and answered the Defendant's call. Mr. Gaines told the Defendant that Mr. Cunningham was acting "funny" and "[a]sking funny questions." Mr. Gaines said that he discontinued his telephone conversations with both men.

Mr. Gaines again spoke with Detective Hafley and another officer the following day, October 11. He said that, when he got to the point in the story at which he was supposed to omit going to the victim's house, he became emotional. He then told them the truth about the shooting. Mr. Gaines said that he took Detective Hafley to the area in the park where he had seen the Defendant walk after the shooting.

During cross-examination, Mr. Gaines agreed that the detective told him that police were going to subpoena Mr. Gaines's phone records. Mr. Gaines agreed that the detective had to "drag" some parts of the story "out of [him.]" Mr. Gaines agreed that he was a "regular" marijuana smoker and had his own suppliers. He said, however, that he asked Mr. Cunningham if he knew anyone who would sell them marijuana because it was so late in the evening and none of the dealers he knew would have been selling at that hour. Mr. Gaines agreed that he had brought the second, inoperable, gun that was in the back seat with Mr. Davis at the time of the robbery. He agreed that he had the gun to "scare people."

Mr. Gaines testified that he knew that, by speaking with police, he was implicating himself. He said, however, he did not know that he could be charged with murder or that he would be taken to jail. He said that, after he was arrested, he spoke with an attorney who informed him that, based on his statements to police, he could be charged with first degree felony murder and especially aggravated robbery. He was advised of the penalties of those offenses, and it was then that he realized the seriousness of the situation. Mr. Gaines agreed that he was hopeful for favorable treatment and maybe some type of leniency in exchange for his testimony.

The Defendant's counsel questioned Mr. Gaines about the time line of events, showing that some of his testimony about the timing of the events could not be correct. Mr. Gaines said that he could not explain why the cell phone records may show that the men were talking to each other on their cell phones when he says that they were at Mr. Featherston's house together. Mr. Gaines said that he "h[u]ng around" members of the Piru and Blood gangs but that he was not a member of either gang.

During redirect examination, Mr. Gaines described the Defendant as calm after the shooting. Mr. Gaines said he was not certain about the specific times of these events, as he was not looking at his watch, but he assumed the McDonald's video accurately reflected the time that they were at the restaurant. Mr. Gaines said that he told the detective the truth because he had never been involved in "anything like that before," so it was "weighing heavy on [his] conscious [sic]." Mr. Gaines said that he and the Defendant had been friends for a long period of time, beginning when they were both in high school. The two spent a lot of time together. Mr. Gaines identified the Defendant as being the person who asked the victim to empty his pockets and then shot him.

During further cross-examination, Mr. Gaines testified that Mr. Featherston's father was Mr. Gaines's mother's uncle. The two were, therefore, second cousins. He said that they were the same age, with their birthdays being only months apart. Mr. Gaines said that Mr. Featherston was his good friend, whom he had known his whole life, and the two lived in close proximity to each other. He said he had known Mr. Hendricks since the two were in elementary school. Mr. Gaines said he had recently met Mr. Davis through Mr. Featherston. Mr. Gaines said that he had known Mr. Cunningham since the two were in high school, about three or four years before the shooting. Mr. Gaines agreed that he was not arrested until ten days after the shooting. He denied that, during that time, he and his friends made a decision about who to blame for the shooting.

Katie Weiss Ladeforged, an attorney with the Public Defender's Office in Nashville, testified that she represented Mr. Gaines in charges stemming from this shooting. She stated that the State had not promised Mr. Gaines anything for his testimony but that he was hoping

for some "consideration" in exchange for his truthful testimony. During cross-examination, Ms. Ladeforged said that Mr. Gaines had remained "completely consistent" in his testimony from the beginning and had "never varied from what he said."

Warren Fleak, a detective with the Metropolitan Nashville Police Department at the time of trial, testified that he had been assigned as the crime scene investigator in this case. He said that, once at the scene of the shooting, he spoke with Detective Hafley, who advised him that the victim had been transported to the hospital. He entered the front yard, which had been secured with crime scene tape, and discovered two bloody shirts, one inside of the other, that had "visible projectile strikes" on the shirt itself. Detective Fleak said that, as he was separating the two shirts back at the station, a projectile fell from between them. He explained that the projectile likely hit "tissue" that slowed it down enough that it lodged between the two shirts. The detective packaged the projectile to send to the Tennessee Bureau of Investigation ("TBI") for further testing.

The detective further testified that he photographed the scene and created a diagram of the scene, all of which were shown to the jury. Detective Fleak said that he also processed a Ford Thunderbird, and he obtained evidence, including a black hat from that vehicle. He also obtained fingerprint evidence from one of the windows of the Ford Thunderbird.

During cross-examination, Detective Fleak testified that the gate of 2912 Highland Drive was open when he arrived. He said that no one requested that he conduct fingerprint testing of the gate. On redirect examination, Detective Fleak testified that a chain link fence would not be conducive to fingerprint testing. The detective identified the report from the firearm expert that tested the projectile. It showed that the projectile was from a "thirty-eight special, a three-fifty-seven magnum, or a nine millimeter Luger." During recross-examination, the detective testified that there were three total projectiles gathered, all of which were likely mutilated from the impact or penetration. He said it was not possible to tell whether they were fired from a thirty-eight special, a three-fifty-seven, or a nine millimeter. Detective Fleak testified that his investigation did not directly implicate the Defendant in the shooting.

Richard Tennent, the criminal defense attorney for Mr. Hendricks, testified that Mr. Hendricks had spoken with the attorney for the State and had agreed to testify. Mr. Tennent was present at those meetings, and the State made no promises to Mr. Hendricks in exchange for his testimony. The State's attorney had asked Mr. Hendricks to testify truthfully and had told Mr. Hendricks that he may get some type of consideration for his truthful testimony. During cross-examination, Mr. Tennent said that it was not totally uncommon for a defendant to testify against a co-defendant, but it was unusual. He said that of the thousands of people he had represented, the State had never offered a written agreement in exchange for

testimony. He believed that the reason for this was, in part, that such an agreement would be a relevant subject for cross-examination. Mr. Tennent testified that, as a result of this incident, Mr. Hendricks was also charged with felony first degree murder and especially aggravated robbery.

Mychal Hendricks, who was twenty-four at the time of trial, testified that he had met the Defendant through a mutual friend about a year before this shooting. He testified that he faced the same charges as the Defendant and that he was testifying in hopes of helping his own legal situation. Mr. Hendricks said that he and Mr. Gaines had become friends in third grade, and he met many of the men involved the night of this shooting through Mr. Gaines and Mr. Cunningham.

Mr. Hendricks confirmed much of Mr. Gaines's testimony about the events of that evening, including that they went to a party, the party was discontinued by the hosts, and then the group went to McDonald's. Mr. Hendricks added that he saw the Defendant with a revolver in the waistline of his pants before they went to the party. From McDonald's, the group traveled to Mr. Featherston's house, after dropping off two of the men. Present at Mr. Featherston's house were: Mr. Gaines; Mr. Cunningham; Mr. Davis; Mr. Featherston; the Defendant; and Mr. Hendricks. Mr. Hendricks said that he, Mr. Featherston, Mr. Davis, and Mr. Gaines were playing with the Play Station as Mr. Featherston got ready to go to "the club." The Defendant and Mr. Cunningham were outside, waiting on the front porch. As the men were leaving Mr. Featherston's house, he heard Mr. Cunningham say to the Defendant, "If you rob him you have to kill him."

Mr. Hendricks said he did not pay much attention to what was being said, and he got into the Defendant's car with Mr. Cunningham and Mr. Featherston. The Defendant was in Mr. Gaines's car with Mr. Gaines and Mr. Davis. Mr. Hendricks said that, as they were driving, Mr. Cunningham received a call from the men in the other car, and they asked him where the victim lived. Mr. Cunningham indicated that they should follow him. Mr. Hendricks said that Mr. Cunningham drove by the victim's house, with Mr. Gaines's car following him. The two cars then traveled to a street away from the victim's house, and stopped there. When they stopped, the Defendant, Mr. Cunningham, and Mr. Gaines exited the vehicles. Mr. Gaines stood on one side of the vehicle, and Mr. Cunningham and the Defendant were talking on the other side. Mr. Hendricks testified that he saw Mr. Gaines bend down behind his vehicle, and he later learned that Mr. Gaines was covering his license plate.

Mr. Hendricks testified that, at this point, he had a feeling that "something bad" was going to happen. When Mr. Cunningham returned to the vehicle, Mr. Hendricks asked him to take him home. Mr. Hendricks said that Mr. Cunningham drove the Defendant's car in

13

one direction, and the Defendant, in Mr. Gaines's car, drove the other direction toward the victim's house. A few minutes later, the men heard between four and five gunshots. Mr. Hendricks said that Mr. Cunningham received a call telling them to meet up at Shelby Woods, and the two cars met at Shelby Woods. Mr. Hendricks said that Mr. Cunningham then told Mr. Hendricks, Mr. Gaines, and the Defendant to go to the "cut" behind Tom Joy Elementary School. There, the Defendant stated that, "He had offed him," meaning that he had killed the victim. The Defendant pulled out what he had taken from the victim, and, while the Defendant and Mr. Cunningham kept most of the money, they gave all of the men "twenty or forty dollars." Mr. Hendricks testified that Mr. Cunningham dropped them off at home.

Mr. Hendricks testified that he did not speak with Mr. Cunningham until days later when Mr. Cunningham called to see if he was all right. Mr. Hendricks said that he was not "in the mood to talk to [any] of them."

Mr. Hendricks testified that the police interviewed him on January 31, 2008. He said that he told the police that the Defendant had shot and killed the victim. He did not, however, tell them the extent of Mr. Cunningham's involvement in the crime or that he knew before the shooting that the victim was going to be robbed and killed. He did tell the police in that interview that he had received money after the robbery. He said that, in a later interview, he told the police about Mr. Cunningham's involvement. He explained that, at first, he was trying to protect Mr. Cunningham because the two had grown up together, and he thought they were friends. He, therefore, told the police at first that, after the robbery, Mr. Cunningham asked the Defendant why he had killed the victim. He said that he was also not completely honest with the police because he was scared the Defendant would retaliate against his family if he was honest with the police. Mr. Hendricks said that, in later interviews with police, he told them that he knew the robbery and killing were going to take place before the incident happened.

During cross-examination, Mr. Hendricks testified that, even though he was scared of the Defendant, he told the police in his first interview that the Defendant had shot and killed the victim. Mr. Hendricks agreed that he described the Defendant to the police as a "menace to society." Mr. Hendricks said that, after the crime, the police attempted to contact him, and he made several appointments that he did not keep with them before his January 2008 interview.

Mr. Hendricks agreed he had told the police that Mr. Davis initiated the crimes that occurred because Mr. Davis said that he needed money. Mr. Hendricks said that he stopped trying to protect Mr. Cunningham when he realized that Mr. Cunningham was not his friend

14

and was "not anybody's friend." This was confirmed for him when Mr. Hendricks was placed in jail on these charges, and Mr. Cunningham began sending him threats.

Mr. Hendricks testified that, when he heard the gunshots, Mr. Cunningham was driving him home. Shortly thereafter, Mr. Cunningham received a phone call telling him to meet in Shelby Woods. They went to Shelby Woods, met the men in the other car, and then Mr. Cunningham took him home. He said he had no intention of going to "the club" with them at any point during that evening. Mr. Hendricks agreed that Mr. Cunningham was a "bully" and a "[p]retty powerful gang member" in the Skyline Piru gang.

During redirect examination, Mr. Hendricks testified that the Defendant had told him that he was going to "put his father's face on someone," meaning that he was going to shoot someone. Mr. Hendricks described the Defendant's behavior after the shooting as "really regular." Mr. Hendricks said that Mr. Cunningham threatened him after he was incarcerated on these charges. He threatened him both before and after Mr. Hendricks spoke with the State about Mr. Cunningham's role in the murder.

Brian Brown, a sergeant with the Metropolitan Nashville Police Department, testified that, at the time of this offense, he was a detective, and he was assigned to assist Detective Hafley, the lead detective in this investigation. Detective Brown described his role in the investigation, saying that, on October 10, 2007, based upon information gained during Mr. Gaines's interview, he went to the park where the men had traveled after the shooting. He and other officers went to the park looking for weapons, and, during the search, they found a cell phone in the woods. He collected the phone and returned it to the department for further analysis.

Mike Frizzell, a special agent with the TBI, testified as an expert in the use of communications records. Agent Frizzell testified that the records indicated that the Defendant's phone called the victim's phone at 12:55 a.m. on September 30, 2007, and the call lasted fifty-three seconds. Mr. Davis's phone was accessing a cell tower in Mt. Juliet earlier in the night, then a cell tower in Nashville, and finally a cell tower near "Club Faded." The agent said that all the men's phones were "[g]enerally" accessing the same cell phone towers during that evening. After 1:00 a.m. on September 30, all the phones analyzed, including the Defendant's phone, were accessing a cell phone tower located near Tom Joy Elementary School.

Paul Harris, a detective with the Metropolitan Nashville Police Department, testified that he retrieved a surveillance video from the corporate headquarters for a company that owns multiple McDonald's restaurants. The video was of the surveillance footage taken at the Mt. Juliet location on the evening of September 29, 2007. Detective Harris said that he

15

assisted Detective Hafley in numerous other ways, but, in one specific instance, he was able to definitively determine that the cell phone found by police officers at the park belonged to the victim.

Curtis Hafley, the lead detective in this case, testified that he responded to the shooting location on September 30, 2007. He said that he attempted to talk to any witnesses present. He spoke with Mr. Beamon, who described the car to him. A few hours later, he spoke with Ms. Haines, who described the car similarly. Ms. Haines also provided the detective with a description of the suspects and told him that a man she knew as "Papa" had called the victim shortly before the shooting. Detective Hafley said that he spoke with other detectives about the man called "Papa," and they were familiar with someone who went by that moniker named Devonta Cunningham. Detective Hafley created a photographic lineup that included Mr. Cunningham's photograph, and, from it, Ms. Haines identified Mr. Cunningham as the man she knew as "Papa."

Detective Hafley testified that Ms. Haines said that Mr. Cunningham had been to the house on a prior occasion with a man named "Mychal" or "Michael," who drove a Ford Thunderbird. From her description of this man, Detective Hafley identified a "Michael Smith" who drove a vehicle matching that description. He spoke with him, searched his car, and later determined that he was not involved in the victim's murder.

Detective Hafley testified that he spoke with Mr. Cunningham later in the day on September 30, 2007. Mr. Cunningham told the detective where he had been, including the house party in Mt. Juliet, the McDonald's in Mt. Juliet, and "Club Faded," and he also offered whom he had been with on the evening of September 29 into the morning hours of September 30. Mr. Cunningham provided Detective Hafley with the cell phone numbers of his associates that night. Detective Hafley used these number to obtain the cell phone records for each of those cell phone numbers.

Detective Hafley testified that the McDonald's surveillance video footage confirmed Mr. Cunningham's account of the men eating at McDonald's that evening. The video also showed the clothing they were wearing and the way that their hair was styled. Detective Hafley said that it stood out to him that one of the suspects, Mr. Davis, had shoulder length braids and was wearing a bright yellow T-shirt. He later spoke with Mr. Davis, who was approximately five-foot ten or eleven inches tall and had an athletic build with broad shoulders and a narrow waist. From the video, the detective also noted that the Defendant looked "very heavy" and was wearing a black T-shirt and dark colored short pants. The Defendant's cell phone was visible during part of the surveillance video.

Detective Hafley spoke with multiple people during the course of his investigation, including Mr. Featherston; Felix Ridley, Jr., who was known as "Hootie;" Mr. Gaines; and Mr. Davis. The detective noted that, during their initial interviews, all six men involved in the shooting gave consistent statements. On October 5, 2007, he spoke with the Defendant, who came to the police station to speak with him. The Defendant agreed to speak with him and waived his *Miranda* rights. The Defendant told the detective that he had spoken with the victim on the night of his death but stated that he and his friends had not gone to the victim's house.

Detective Hafley testified that Ms. Haines gave him information about the victim's cell phone, which was not found at the scene of the shooting. He said that he began getting phone records from the suspects in this case shortly after the murder. While the information did not include the cell phone towers involved, they did provide him a list of calls made and the time and duration of those calls. He learned that the cell phones belonging to both Mr. Gaines and the Defendant had placed and/or received calls to the victim's phone. Detective Hafley said that, when he received the phone records showing the cell phone towers used by the Defendant's phone, the records indicated that the Defendant was not where he had said at the time he had said during the evening of the shooting.

On October 9, 2007, Detective Hafley conducted a follow-up interview with Mr. Gaines. During Mr. Gaines's initial interview, he had denied going to the victim's house the evening of the shooting. During the October 9 interview, Mr. Gaines became "emotional." Mr. Gaines then told him the same version of events that he offered during his trial testimony.

Detective Hafley testified that, almost six months later, on March 25, 2008, he interviewed the Defendant. The Defendant cried during the interview, but it "seemed very fake" to the detective. Detective Hafley said that he attempted to follow-up on leads the Defendant provided, including a man who the Defendant knew as "Regardless." He said that he was unable to confirm such a man existed. Detective Hafley testified that the Defendant's phone records did not match the story that he had given to the detective.

During that interview, a recording of which was entered into the record, the Defendant described for the officers how he had been beaten at a party after he had been accused of "snitching." Officers informed the Defendant that his co-defendants had said that he had been the one threatening them for "snitching." The officers also told him that all his co-defendants had been to speak with the police and that the "only one they had given up" was the Defendant. The Defendant said that the other men were ganging up against him in an attempt to save each other because the Defendant was no longer friends with those men.

17

After extensive discussions, the Defendant told the detectives the following version of events that evening: He said that Mr. Cunningham borrowed his phone to set up a purchase of marijuana from Mr. Sanders while the two were parked on the side of the road. After arranging the purchase, Mr. Cunningham got into Mr. Gaines's vehicle, in which "Flame" was also located, while the Defendant waited for him to return. The Defendant said that Mr. Cunningham had a gun. The Defendant said that Mr. Cunningham called him and told him to meet behind Tom Joy Elementary School. There, Mr. Cunningham gave some of the men money and some of the men marijuana. The Defendant did not take money or marijuana, but Mr. Cunningham purchased gas for the Defendant's car. He said that the men then went to Mr. Gaines's house, where they stayed for some period of time before most of the men got into his car, and he drove them to the club.

During cross-examination, Detective Hafley testified that he arrived at the scene of the shooting less than an hour after the shooting had occurred. He said that he interviewed Mr. Beamon at the scene, and Mr. Beamon gave a description of one of the men involved as being 6'2" or 6'3" and weighing 280 pounds and wearing a dark shirt and dark shorts. He also described the second man as wearing a white shirt and long pants. Detective Hafley confirmed that Mr. Beamon was unable to identify anyone from a photographic lineup.

Detective Hafley agreed that the majority of the evidence against the Defendant was provided by his co-defendants. He agreed that the eye witnesses varied in their description of the men involved The detective agreed that Mr. Gaines best fit Ms. Haines's description of a light-skinned African-American male who was tall and slim, but in light of all the evidence, he did not believe that it was Mr. Gaines who was out of the car on the night of the shooting. The detective agreed that each of the men he interviewed lied about the events of that evening. He said that, when they were arrested several months after the shooting, Mr. Hendricks was found at a bus station and Mr. Featherston was found hiding in a closet. The detective agreed that, in the Defendant's statement, he said that Mr. Cunningham used the Defendant's cell phone while the men were in Mt. Juliet.

Detective Hafley acknowledged that the phone records contradicted Mr. Gaines's testimony that no one in his car with him made any phone calls. Mr. Gaines's phone records indicated that he placed a call to, and received a call from, the Defendant's phone shortly after the shooting. There was also a call placed from Mr. Gaines's phone to Mr. Davis's phone thirty minutes after the shooting. Mr. Gaines and Mr. Davis had both testified, however, that they were together at that time. The detective explained that the park was two minutes from where the shooting occurred. He said that these calls were thirty minutes after the shooting, and the men could have been in different locations by that time.

18

Amy McMaster-Hawes, the Chief Medical Examiner for Davidson County, testified that she conducted the autopsy of the victim's body. She learned that the victim was a twenty-one year old male who had suffered multiple gunshot wounds. His body showed evidence of medical staff's attempt to save his life, including a breathing tube, catheters, and IVs. Dr. McMaster-Hawes testified that she noted three gunshot wounds to the victim's torso, two entrance wounds on the left side of his chest and another entrance wound to his left abdomen area. There was one exit wound to the left side of his back. The victim's body also had a gunshot wound to his right hand. None of the wounds showed "stippling," meaning that either the gun was more than a couple of feet away from the victim when discharged or there was something between the barrel of the gun and his skin, like a shirt. Dr. McMaster-Hawes said that any one of the three gunshot wounds would have been fatal. Together the wounds injured the victim's left lung, heart, diaphragm, liver, stomach, pancreas, spleen, and ribs. She recovered two bullets from inside his body.

Dr. McMaster-Hawes testified that she conducted a complete toxicology exam. The report indicated that the victim had the presence of the chemical derived from the use of marijuana in his blood. She concluded that the victim died of the gunshot wounds and that the manner of death was a homicide.

The Defendant presented evidence on his own behalf. The Defendant attempted to call Michael Miller, who refused to testify. The trial court declared him an unavailable witness and held him in contempt of court. Mr. Miller's previous testimony was then read into the record. During that previous hearing, Mr. Miller testified that he was in jail facing unrelated charges. He said that he knew Mr. Gaines because the two had been housed in a detention center together. Mr. Miller said that Mr. Gaines told him that he had been arrested for murder and that "[the State] really didn't want him that they wanted somebody else." He told Mr. Miller that "it wasn't really snitching if he just lied and said anything he had to say to get out of jail." Mr. Miller testified that Mr. Gaines said he was going to say what he needed to say in order to obtain a probation sentence.

Mr. Miller testified that he also knew Mr. Cunningham. The two had met while incarcerated around May 2012. Mr. Miller said that, during his discussions with Mr. Gaines, Mr. Miller learned that Mr. Gaines was one of Mr. Cunningham's co-defendants.

During cross-examination at the previous hearing, Mr. Miller testified that he was facing charges of especially aggravated kidnapping. He also had been convicted on several previous occasions. Mr. Miller agreed that Mr. Gaines likely did not want to be considered a snitch.

Ronteraus Roberson testified that he was from New Orleans and came to Nashville to visit the mother of his child. He was in Nashville for nine days, during which time he was arrested for facilitation of first degree murder and attempted second degree murder. He said that he was currently serving twenty-five years at thirty-five percent. Mr. Roberson said he met Mr. Featherston, whom he knew by the nickname "Yellow," in 2009, while the two were detained at Blackwood jail. Mr. Roberson was moved from Blackwood to the Criminal Justice Center, where he met Mr. Gaines in 2012. The two were "pod mates" and became friendly. Mr. Roberson said that, at points during his confinement, he was also in the same pod with Mr. Cunningham, Mr. Hendricks, and Mr. Davis. He had also met the Defendant in prison at one point. Mr. Roberson said that the Defendant and Mr. Featherston told him that they were in jail for murder. Mr. Roberson said that he did not anticipate gaining anything for his testimony.

Mr. Roberson testified that Mr. Gaines discussed the charges that he was facing. Mr. Gaines told him that he was "going to lie on them" so that he could get a reduction in the amount of time that he would have to serve. Mr. Gaines said that he hoped that, in exchange for his testimony, he would be given probation. Mr. Roberson understood this to mean that he was going to lie about the involvement of a man named "Dray," whom Mr. Roberson did not know, and Mr. Cunningham, with whom Mr. Roberson had previously been housed.

During cross-examination, Mr. Roberson agreed he had also previously been convicted for two felony drug convictions and for evading arrest. Mr. Roberson agreed that he was a member of the gang commonly referred to as the "Bloods" and that he had multiple tattoos reflecting his gang affiliation.

Mr. Roberson said that the Defendant was his "acquaintance." Mr. Roberson said that he was unaware whether the Defendant was a member of the "Blood" gang. Mr. Roberson agreed that he would do what he could to assist other members of the "Blood" gang. He said that Mr. Gaines was not a member of the "Blood" gang. Mr. Roberson agreed that Mr. Gaines would be classified as a "snitch," which was a bad thing. He disagreed, however, that snitches would be beaten up and threatened while incarcerated.

Mr. Roberson testified that he was "very good friends" with Mr. Cunningham. He disagreed, however, that they were in the same gang, saying that Mr. Cunningham was a member of the "Piru" gang. He disagreed that "Piru" and "Blood" were different names for the same gang. He explained that the two gangs were the "underdogs" and would team up together to go after the "Crips," but he maintained that they were two separate, individual gangs.

20

Mr. Roberson agreed that an "OG" was a gang member who had earned a higher rank. An "OG" would give a lower ranked gang member instructions and direct them into committing a crime in order to advance in a gang. Mr. Roberson agreed that, at a prior hearing, he said that Mr. Gaines had told him that he was going to blame Mr. Cunningham and not the Defendant.

Shirley Smith, the Defendant's mother, testified that she learned that one of the Defendant's co-defendants had testified that the way the Defendant could shoot someone was to imagine them with his father's face. She said she learned that they said the Defendant had explained that his father used to beat his mother. Ms. Smith said, however, that the Defendant did not know his father and that no man had ever lived in their home. She said that she had never been beaten by anyone and that the Defendant would have no reason to say something like this.

The Defendant testified that he did not shoot the victim. He said that Mr. Cunningham told him that he had shot the victim a couple of days after the shooting. He recalled that the two were in Mr. Cunningham's backyard when Mr. Cunningham admitted to him that he had robbed and shot the victim. At the time, the Defendant already knew that the victim had been shot but did not know the identity of the shooter. The Defendant described the events surrounding Mr. Cunningham's confession, saying that Mr. Cunningham invited him over to discuss something important. When the Defendant arrived, Mr. Cunningham was in the backyard washing his dogs. Mr. Cunningham told him that the police had come to talk to him. The Defendant said he asked Mr. Cunningham, "About what?" Mr. Cunningham told him that it was about the victim. Mr. Cunningham confessed that he had robbed and killed the victim. Mr. Cunningham told the Defendant that he had told the detective that he and the Defendant were together that evening.

The Defendant said he asked Mr. Cunningham why he had said the two were together, and Mr. Cunningham reminded the Defendant that he had used the Defendant's phone. Mr. Cunningham told the Defendant to tell the detective that the Defendant did not have anything to do with the shooting. The Defendant said that Mr. Cunningham told him to tell the detective that the Defendant had set up the drug buy for some other men who wanted to purchase some marijuana. The Defendant said he told Mr. Cunningham, "You, bullshitting, man" and "You tripping." Mr. Cunningham told the Defendant that he had nothing to worry about and to stick to that story. The Defendant said this conversation occurred before the Defendant had spoken with Detective Hafley.

The Defendant testified that, when he spoke with the detective, he told him the story that Mr. Cunningham had instructed him to tell. After the interview, he thought that

Detective Hafley believed him. He said that when he left the interview he called Mr. Cunningham and told him about the interview.

A couple of days later, the Defendant saw Mr. Cunningham and some of his "associates" at a club. As he was leaving the club, Mr. Cunningham and some of the men he was with, one of whom was known as "Lon-ball", approached him and said that they had heard he was "snitching." He said he could not get a sentence out before he was assaulted. He said that his jaw was broken on both sides. He went to the emergency room and was referred to an oral surgeon, who wired his mouth shut. His mouth was wired shut for three months. The Defendant said that, after this, he stayed away from Mr. Cunningham, who was his only friend in the group. He said he knew Mr. Gaines from school but that the two were not friends. The Defendant said that Mr. Cunningham, Mr. Gaines, and Mr. Hendricks were all "Skyline Piru" gang members. Mr. Featherston, he said, was a "Treetop Piru" gang member, a gang that was "one in the same" as the "Skyline Piru" gang. The Defendant said he was a member of the "Bounty Hunter Blood" gang, which was different from the "Piru" gang. He said that the two were "rival" gangs. He said that, even though they were in rival gangs, he and the Defendant were friendly because they lived in close proximity to each other and both raised pit bull dogs.

The Defendant testified about what he said actually happened that evening. He confirmed going to the party in Mt. Juliet and then to the McDonald's. He said that he lent his phone to Mr. Cunningham, whose phone battery had died. He said that, in his car with him that evening, were Mr. Featherston, Mr. Hendricks, "Hammer," and "Hootie." He said that he drove "Hootie" and "Hammer" home. Mr. Gaines met them where they dropped off "Hootie" and "Hammer." The men were attempting to "kill time" before the club opened at 2:00 a.m.

The Defendant said he followed Mr. Gaines. The men stopped at some point, and the Defendant overheard conversations about marijuana. Because he did not smoke marijuana, he did not pay attention to these conversations. The Defendant said that, after Mr. Cunningham had found someone from whom to purchase marijuana, he asked the Defendant if the Defendant would follow him to buy it. The Defendant declined, saying that he would just meet the men at the spot behind Tom Joy Elementary School. The Defendant said that he arrived at the spot first and that Mr. Cunningham, Mr. Gaines, and Mr. Davis arrived shortly thereafter. The men began separating the marijuana, and Mr. Cunningham was counting money. The Defendant said Mr. Cunningham asked the Defendant if they were still going to the club. The Defendant said yes and asked who was driving. Mr. Cunningham told him to drive, and the Defendant said that he responded that he was tired of driving. The Defendant said that, if he drove, the men needed to put gas into his car.

22

The Defendant said that the men dropped Mr. Hendricks off at home. He then followed Mr. Gaines to Mr. Gaines's house, where the men talked for a brief period of time. While there, Mr. Gaines's mother's boyfriend stopped by. The Defendant said that all five men, Mr. Gaines, Mr. Featherston, Mr. Cunningham, Mr. Davis, and himself, then got into the Defendant's car and went downtown to the club. The Defendant said that, this whole evening, no one mentioned the robbery or shooting, and he did not know that it had occurred.

The Defendant said that he thinks that the men chose him to blame because they thought that he was going to implicate them, which he was not. He said that Mr. Cunningham was "OG on Skyline," so he "called [the] shots."

The Defendant said that he did not know the victim well and that he did not have the victim's telephone number. He said that the two had gone to school together and so he knew "of the victim," but they were not friends.

During cross-examination, the Defendant testified that he had told the police that Mr. Cunningham always carried a gun. He said he too was familiar with guns, but he did not carry them as frequently as Mr. Cunningham. The Defendant agreed that he told the detective about the license plate on Mr. Gaines's car being covered. He explained that the detective must have told him that fact, and he maintained that he did not know that a robbery was going to occur before it occurred. The Defendant testified that, before the shooting, the men did not go to Mr. Featherston's house but that they went to a location off Dickerson Pike and got out of their cars and talked before Mr. Cunningham went with Mr. Gaines to purchase marijuana. The Defendant testified that he went from the location off of Dickerson Pike to Tom Joy Elementary School, and, when he arrived at the school, Mr. Gaines called him to ask him if he had arrived at the school yet. Shortly thereafter, Mr. Gaines and Mr. Cunningham arrived. Mr. Cunningham divided up the marijuana, but the Defendant did not take any because he did not smoke marijuana. Mr. Cunningham then asked if anyone needed money for the club, and the Defendant responded that he was "straight," meaning he did not need any money.

In rebuttal, the State called Xica Featherson, Lance Featherston's brother, who testified that around the time of this shooting he lived in a house with his mother, father, two brothers, and his daughter. Xica Featherston said that, the evening of September 29, 2007, he saw his brother at their home with Mr. Cunningham, the Defendant, Mr. Davis, and Mr. Hendricks. The men were playing a game and hanging out. Xica Featherston estimated that the men were at the home for approximately thirty minutes. During cross-examination, Xica Featherston said that he loved his brother and wanted to protect him. He said that Mr. Gaines was his cousin and that they were "close." Xica Featherston said that, at the time, he and Mr.

23

Cunningham had a relationship that was "more than just friend" but that they were not "boyfriend[s]."

Kevin Carroll, an officer with the Davidson County Sheriff's Office, testified and offered a list of everyone who was in Mr. Gaines's jail pod in May of 2012. This was entered as an exhibit and showed that Mr. Roberson was not listed as being in Mr. Gaines's pod at the time. During cross-examination, Officer Carroll testified that he was not asked by the State to pull records for months around and near May 2012, including April, March, June, or July.

Detective Mark Anderson, with the Metropolitan Nashville Police Department, testified as an expert in gang activity that there was no difference between the Blood gang and the Piru gang. He said that a gang member could achieve the rank of "OG," which stood for "Original Gangster." Detective Anderson testified that an "OG" had the authority to direct the actions of lower ranking members. Lower ranking members gain rank based upon the amount of violence they commit on behalf of the gang: shootings, robberies, and assaults. Detective Anderson stated that, "The ultimate thing would be to commit a homicide." Detective Anderson said that if a gang member did not follow an "OGs" instructions they could be beaten or excommunicated from the gang.

During cross-examination, Detective Anderson testified that "Piru" could stand for "Crip" written backward with the letter "c" turned to the side. He agreed that he had heard this theory before, but he said he had also heard that it was based upon the name of a street in California. He agreed that "Piru" Street in California was originally a street that belonged to the Crip gang. He maintained that, now, the Blood and the Piru were members of the same gang.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder and especially aggravated robbery, and the trial court sentenced him to concurrent sentences of life and twenty years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred when it denied his motion for mistrial based upon the State's alleged failure to disclose exculpatory evidence; and (3) the trial court erred when it failed to admit into evidence a text message sent from one of his co-defendants to the other co-defendant.

## A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain either his conviction for first degree felony murder or especially aggravated robbery. He notes that there was no physical evidence tying him to the crime and that the witnesses' descriptions of the robbers were inconsistent. The State counters that the evidence, viewed in the light most favorable to the State, was more than sufficient to support the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of first degree felony murder and especially aggravated robbery. A conviction for first degree murder, as charged in the indictment, requires "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). The only mental state required to commit felony murder is the intent to commit the specific felony. T.C.A. § 39-13-202(b). Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon" where the victim suffers "serious bodily injury." T.C.A. § 39-13-403(a). Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103. "Serious bodily injury," which is defined to include "high risk of death," also inherently includes the death of the victim.

A defendant may also be convicted of a crime as a principal actor pursuant to the statute codifying criminal responsibility. Tennessee Code Annotated section 39-11-402 provides in part:

A person is criminally responsible for an offense committed by the conduct of another, if:

. . .

26

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . .

Recently, in *State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013), our Supreme Court explained:

> Criminal responsibility is not a separate crime, but "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility represents a legislative codification of the common law theories of aiding and abetting and accessories before the fact. *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).

Accordingly, "defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997)).

In the case under submission, viewing the evidence in the light most favorable to the State, it showed that the Defendant and Mr. Cunningham discussed purchasing marijuana from the victim. Mr. Hendricks heard Mr. Cunningham tell the Defendant that he could rob the victim but that he would have to kill him. Mr. Gaines, who was going to drive, covered his license tag with a bag so as to be less identifiable at the scene. When they arrived at the victim's house, the Defendant threatened the victim with a gun. The victim gave the Defendant his money and the marijuana. The Defendant also took the victim's cell phone. The Defendant then shot the victim three times, got back into Mr. Gaines's car, and continued to fire as the men went to a park. At the park, the Defendant walked to an area where he disposed of the victim's phone, and the police found the cell phone in the park. He then met Mr. Cunningham and the other men behind Tom Joy Elementary School and divided up the money and marijuana that he had obtained. This evidence is sufficient to support the Defendant's conviction for especially aggravated robbery and for felony murder based upon that robbery.

The Defendant takes issue with the witnesses's inconsistent description of the robbers. As previously stated, "[q]uestions concerning the credibility of the witnesses, the weight and

value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. Further, even if the Defendant was not the shooter, there was sufficient evidence to convict the Defendant based upon him being criminally responsible for the actions of another. By all accounts, even if the Defendant was not the actual shooter, he was with the men before and after the robbery. The jury did not accept his testimony that he was unaware that the robbery was going to occur before it happened and that he did not accept any of the proceeds of the robbery. The evidence is sufficient to support his convictions based upon a theory of criminal responsibility. The Defendant is not entitled to relief on this issue.

### B.  Motion for Mistrial

The Defendant next contends that the trial court erred when it denied his motion for a mistrial based upon the State's failure to disclose exculpatory evidence. The Defendant asserts that the State failed to disclose the cell phone records of a phone with which Mr. Featherston had contact shortly after the shooting. During a hearing outside the presence of the jury, it came to light that the number associated with the cell phone that Mr. Featherston contacted belonged to a "Taja High," who police believed to be Mr. Featherston's girlfriend. There were multiple calls between Ms. High's cell phone and Mr. Featherston's cell phone around the time of the murder. The State counters that the Defendant has not demonstrated that he suffered a due process violation. It further contends that the Defendant ultimately received the records at trial and has failed to show that he was prejudiced by the delayed disclosure of the evidence.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To prove a *Brady* violation, a defendant must demonstrate that: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not); (2) that the State suppressed the information; (3) that the information was favorable to the defendant; and (4) that the information was material. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). Favorable evidence has been defined as:

> [E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). Evidence is material when "'there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (citations omitted). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Id.*

In this case, the Defendant requested all the State's records in his motion for discovery. The State offered the Defendant open file discovery. The phone records at issue were not, however, contained in that file because Detective Hafley did not include those records in the information he gave to the State. Detective Hafley's possession of those records is imputed to the State for purposes of determining a *Brady* violation. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014) (holding "*Brady* applies not only to evidence in the prosecution's possession, but also to "'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'") (citations omitted).

We must next determine if the State "suppressed" this evidence. The Defendant clearly had access to Mr. Featherston's phone records, which showed the calls to Ms. High's number around the time of the crime. He could have, in his own investigation, pursued the identity of the owner of that cell phone. The evidence about which the Defendant complains are the records of the cell phone belonging to Mr. Featherston's girlfriend, which were ultimately disclosed during the trial. This Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting); *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999) (citations omitted). Where there is a delayed disclosure of evidence, this court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Caughron*, 855 S.W.2d at 548 (citing *United States v. Ingraldi*, 793 F.2d 408, 411-12 (1st Cir. 1986)). "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of the evidence.'" *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), *opinion vacated and reentered by State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 485614, at *1 (Tenn. Crim. App., at Nashville, Aug. 18, 1998) (quoting *Nassar v. Sissel*, 792 F.2d 119, 121 (8th Cir. 1986)). An incomplete response to a *Brady* request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness

regarding the evidence, the *Brady* violation may be cured. *Ewing*, 1998 WL 321932, at *9. The Defendant in this case moved for a mistrial but not a continuance. We cannot state with certainty that the delayed disclosure of the co-defendant's girlfriend's phone records "itself caused prejudice." For sake of argument, however, we will consider the other relevant factors.

We will now decide whether Mr. Featherston's girlfriend's cell phone records were "favorable" to the Defendant. The Defendant asserts that the phone records show that Mr. Featherston's cell phone placed calls and/or received calls from his girlfriend, Ms. High, around the time of the murder. Detective Hafley attempted to speak with Ms. High, and he could not locate her. When he arrested Mr. Featherston at his girlfriend's house, all the people there were extremely uncooperative and provided him no information. The Defendant has offered no further information about how the cell phone records, which he ultimately had during the trial, would have aided his defense.

The Defendant has similarly not proven that the evidence the State suppressed was "material."

> The [United States] Supreme Court in *Kyles* discussed materiality at length and reiterated four key points. [*Kyles v. Whitley*, 514 U.S. 419, 434-37 (U.S. 1995)]. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* at 434, 115 S. Ct. 1555; *see also Johnson*, 38 S.W.3d at 58. Second, determining materiality is not the equivalent of determining the legal sufficiency of the evidence. *Kyles*, 514 U.S. at 434-35, 115 S. Ct. 1555. Third, where a defendant establishes materiality, along with the other three elements necessary to show a *Brady* violation, the defendant also has inherently established that the violation was not harmless; thus, a separate harmless error analysis is unnecessary and inappropriate. *Id.* at 435, 115 S. Ct. 1555; *see also Johnson*, 38 S.W.3d at 63; *State v. Biggs*, 218 S.W.3d 643, 660 (Tenn. Crim. App. 2006). Fourth, the materiality of suppressed evidence should be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436, 115 S. Ct. 1555. In this way, the prosecutor's responsibility is "to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.* at 437, 115 S. Ct. 1555.

> > [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have

30

received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434, 115 S. Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S. Ct. 3375); *see also Johnson*, 38 S.W.3d at 58. Failing to disclose *Brady* materials may impair the adversary process in various ways, including causing the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Bagley*, 473 U.S. at 682, 105 S. Ct. 3375. A defendant seeking to establish materiality should call to the attention of the reviewing court any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding.

*Jackson*, 444 S.W.3d 595.

The State prosecuted the Defendant pursuant to two theories: first, that he was the shooter; second, that he was criminally responsible for the shooting. Mr. Featherston was also indicted for these crimes. The Defendant had Mr. Featherston's cell phone records, which showed that he placed calls around the time of the shooting. The fact the Defendant did not have the cell phone records from Mr. Featherston's girlfriend, which confirmed that Mr. Featherston had contact with her around the time of the shooting, does not undermine our confidence in the outcome of this trial. The Defendant is not entitled to relief on this issue.

### C. Text Message

The Defendant next asserts that the trial court erred when it failed to admit into evidence a text message sent from Mr. Featherston to Mr. Cunningham. The Defendant asserts that he attempted to cross-examine Detective Hafley about an email that Detective Hafley sent to another police officer that contained a picture of a text message that Mr. Featherston sent to Mr. Cunningham. The text message read "got a dope boy nine on me." The Defendant's counsel argued that the "dope boy" in the message was the victim, who was a drug dealer, and that the "nine on me" referred to the nine millimeter that had been taken from the victim during the robbery. The Defendant's counsel stated that this text message was an "admission of culpability" by Mr. Featherston to committing this shooting. The State contends that the trial court properly excluded this evidence as inadmissible hearsay.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible in evidence except as provided by exceptions in the Tennessee Rules of Evidence or other applicable law. *See* Tenn. R. Evid. 802. "[W]hen, in a particular case, the rule against hearsay operates to deprive a defendant of his or her right to present relevant and reliable evidence that is critical to establish a defense, the rule against hearsay must yield to the defendant's constitutional right to present a defense." *State v. Brown*, 29 S.W.3d 427, 436 (Tenn. 2000). That evidence should have "considerable assurances of reliability."

In the case under submission, the Defendant sought to introduce a text message from one of his co-defendants, Mr. Featherston, to another co-defendant, Mr. Cunningham. The text message read "got a dope boy nine on me." While we find that this evidence is relevant, it is also hearsay, and the Defendant does not cite to any hearsay exception that would apply. While, under some circumstances, a statement by a codefendant may fall into any number of hearsay exceptions, the Defendant has not made the requisite showing that any of those exceptions apply in this case. Further, we cannot conclude that this evidence is "reliable" or that it is "critical" to the defense so as to require the hearsay rule to yield to the Defendant's constitutional right to present a defense. First, it is not at all clear what the text message means. Second, the Defendant's theory of defense was that it was Mr. Cunningham rather than Mr. Featherston who shot the victim. Finally, the jury by its verdict believed that the Defendant was part of a conspiracy with both Mr. Featherston and Mr. Cunningham. More evidence showing that the two men colluded before or after this shooting would not have aided his defense. Accordingly, we conclude that the trial court did not abuse its discretion when it denied the Defendant's request to ask Detective Hafley about this text message. He is not entitled to relief on this issue.

32

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE